UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ROSE AMOUGOU NGASSAM | : | Case No: **07** Civ. **8172** |
| Plaintiff, | : | |
| | : | |
| v. | : | VERIFIED COMPLAINT |
| | : | |
| MICHAEL CHERTOFF, Secretary of Department of Homeland Security; EMILIO GONZALEZ, Director of the United States Citizenship and Immigration Services; F. GERARD HEINAUER, Director of the Nebraska Service Center of the United States Citizenship and Immigration Services; | : | |
| Defendants. | : | |

Plaintiff, Rose Amougou Ngassam ("Ms. Ngassam"), by her attorneys, the Center for Social Justice, Seton Hall Law School of Law, Immigration and Human Rights Clinic ("Counsel"), for its Complaint against the Defendants, alleges as follows:

## NATURE OF ACTION

1) This is an action seeking preliminary and permanent injunctive relief compelling the named government agencies to comply with all federal regulations governing the issuance of I-730 asylee-relative petitions, and accordingly, to grant the petitions filed by Rose Ngassam on behalf of her seven children.

2) The United States Citizenship and Immigration Services ("USCIS") denied three of Ms. Ngassam's seven petitions in spite of conclusive DNA evidence establishing that

she is the mother of her children-beneficiaries, and certified duplicates of the children's birth certificates establishing the children's age. In light of that evidence, Ms. Ngassam's children are eligible for derivative asylum and reunification with their mother in the United States.

3) In denying the petitions, USCIS ignored primary evidence of the children's eligibility for asylee-relative status —certified duplicates of their birth certificates—in direct contravention of the agency's own regulations. Thus, the agency rejected the petitions without a valid legal or statutory basis in violation of the Administrative Procedures Act ("APA").

4) As a direct result of Defendants' unlawful conduct, Ms. Ngassam has been deprived of her legal right to reunify with three of her children and has been subjected to ongoing psychological trauma.

5) Based on the substantial evidence establishing her children's eligibility for derivative asylum, Plaintiff seeks immediate approval of the three petitions wrongly revoked by USCIS.

6) Plaintiff seeks a Declaration that the Defendants' decision was unlawful and an order setting aside the agency findings as arbitrary, capricious, contrary to the weight of the evidence and otherwise not in accordance with law.

7) Ms. Ngassam further seeks an order compelling USCIS to facilitate the expeditious visa processing of all of her children's visas and prompt reunification with all six of her children who remain in Cameroon.

8) Plaintiff further seeks an assessment and award to Plaintiff to recover its reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act (EAJA), 28

U.S.C.A. § 2412, along with any other and further relief that the Court deems just and proper.

## JURISDICTION

9) This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1361 (Mandamus Act) and 5 U.S.C. §§ 701. *et seq.* (Administrative Procedures Act or "APA"). This court may also grant relief in this action under 28 U.S.C. § 2201 (Declaratory Judgment Act).

10) The Plaintiff has exhausted all administrative remedies. USCIS denied three of Ms. Ngassam's petitions, a final decision for which the immigration regulations provide no appeal. See 8 C.F.R. § 208.21(e) ("No appeal shall lie from this decision.").

## VENUE

11) Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391(e)(3) because the defendants are officers of the United States sued in their official capacities; and the Plaintiff resides in this District.

## PARTIES

12) Plaintiff, Rose Ngassam, is a national of Cameroon who was granted political asylum by the United States in June 2003.[1] Plaintiff lives at 1775 Davidson Avenue, Apartment 2H, Bronx, New York 10453. On September 10, 2003, Ms. Ngassam filed seven I-730 asylee-relative petitions on behalf of her children, whom she was forced to leave behind in Cameroon when she escaped under threat of death and further

---

[1] See Exhibit 1, Order from Newark Asylum Office Granting Asylum.   All Exhibits referenced herein are attached the Affidavit of Jenny-Brooke Condon, Esq. In Support of Order to Show Cause for Preliminary Injunction.

torture in 2002. She challenges USCIS's denial of her right to reunify with her
children.

13) Defendant F. Gerard Heinauer, NSC Director, is an official of the United States
Citizenship and Immigration Service ("USCIS"), Nebraska Service Center ("NSC"),
in Lincoln, Nebraska, and is charged with supervisory authority over all operations of
the USCIS within the Nebraska Service Center, including the adjudication of asylee-
relative petitions like those filed by Ms. Ngassam. Defendant Heinauer is sued in his
official capacity.

14) Defendant Dr. Emilio T. Gonzalez, the Director of USCIS, is charged with
supervisory authority over all operations of USCIS. Under authority delegated to him
pursuant to 8 U.S.C. § 1103(a) and 8 C.F.R. § 103.1(1), he is charged with
responsibility for the administration and enforcement of the Immigration and
Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* He is sued in his official capacity.

15) Defendant Michael Chertoff is the Secretary of the Department of Homeland Security
("DHS"), the Federal agency charged with the administration of the Illegal
Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), as well
as the INA and Amendments thereto. He is sued in his official capacity.

## **FACTUAL BACKGROUND**

16) Plaintiff Rose Ngassam, a mother of seven, was a committed AIDS activist in
Cameroon and a member of the Social Democratic Front (SDF), a pro-democracy
political organization.[2] Ms. Ngassam also worked on behalf of an NGO called

---

[2] See Exhibit 2, Affidavit of Rose Ngassam, Submitted in Support of Asylum
Application.

"Unisson Contre le Virus," which sought to stanch the spread of AIDS in Cameroon through public education and outreach. See Ex. 2, Ngassam Asylum App. Aff. ¶ 26.

17) Cameroonian police officers arrested and imprisoned Ms. Ngassam three times between 2000 and 2002 in retaliation for her AIDS advocacy work, which the government saw as a threat to its authority. Id. at ¶ 38-102. Ms. Ngassam's torturers wrongly believed that the SDF funded Ms. Ngassam's AIDS work to embarrass the government by bringing attention to the Cameroonian AIDS epidemic. Id. at ¶ 50.

18) Police officers severely tortured Ms. Ngassam throughout each of her detentions; during one period of arbitrary detention, police officers tortured Ms. Ngassam in spite of the fact that she was six months pregnant. Id. at ¶ 38-102. After releasing her from prison after her third arrest, police officers ordered Ms. Ngssam to report to the police commissariat on a daily basis. Id. at ¶ 98-102. On the first two days that she reported to the station, a different officer raped Ms. Ngassam. Id. at ¶ 98-101. Ms. Ngassam then sought the help of her brother-in-law to flee to permanent safety abroad. Id. at ¶ 102.

19) Ms. Ngassam also suffered persecution in Cameroon at the hands of her husband, who was a gendarme—a member of the military police. Id. at ¶ 30-34, 37. He beat Ms. Ngassam and subjected her to extreme cruelty, refusing to intervene, even though he was a gendarme, when the Cameroonian government imprisoned and tortured her. Id. at ¶ at 31-32; 56.

20) When Ms. Ngassam fled Cameroon in 2002 to seek refuge in the United States, she was forced to leave behind her seven children, an agonizing decision. Id. at ¶ 104-106.

21) The United States granted Ms. Ngassam asylum status in June 2003 because of the persecution and torture she suffered in Cameroon on account of her political beliefs and advocacy, and her well-founded fear of further harm if she were forced to return. See Ex. 1, Order Granting Asylum.

22) Once in the United States, Ms. Ngassam learned from her family members that the police were still looking for her and harassing her family. See Ex. 2, Ngassam Asylum App. Aff. ¶ 112. In early 2003, neighbors in Cameroon, whom Ms. Ngassam spoke with by phone, informed her that the police had detained and beaten two of her sons, then 13- and 16-years-old. Id. at ¶ 113. Ms. Ngassam also learned that the government murdered her brother-in-law who helped her escape. See id. at ¶ 110. Ms. Ngassam believes that her brother-in-law was killed in retaliation for helping her.

23) Since Ms. Ngassam fled Cameroon in search of safety, she has spent every day worrying about her children's safety and fighting to reunite with them in the United States.[3] As noted in a recent evaluation of Ms. Ngassam's psychological status, Ms. Ngassam experiences constant, daily anguish as a result of the delay in reunification.[4] She experiences a "deep fear for the welfare of her children she left behind to save her own life, yet powerless to facilitate the relocation of her children to the U.S., where they would be safe." Ex. 5, Kahn Aff. ¶ 14. Ms. Ngssam's torment is further amplified by her knowledge that the "option of return to Cameroon to be with them is impossible because her own life would be in grave danger." Id.

---

[3] See Exhibit 3, Affidavit of Rose Ngassam, Submitted in Support of Preliminary Injunction.
[4] See Exhibit 5, Affidavit of Sara Kahn, M.S.W., Psychological Evaluation of Rose Ngassam, at ¶ 14.

24) Under the law, asylees such as Ms. Ngassam may extend derivative asylum on qualifying family members and reunite with them in safety immediately in the United States—meaning as soon as the principal files an asylee-relative petition, USCIS processes the petition, and a visa is issued abroad. 8 C.F.R. § 208.21(d).

25) On September 15, 2003, Ms. Ngassam filed seven I-730 asylee-relative petitions with the Nebraska Service Center with each of her children named as beneficiaries. Although all seven of Ms. Ngassam's petitions were initially approved, only one of Ms. Ngassam's sons was granted a visa to travel to the United States last fall— nearly three years after she filed her petitions.

26) Then, in May 2007, USCIS reopened and denied three of her children's asylee-relative petitions—a decision from which there is no appeal—in spite of critical, material evidence relevant to the children's eligibility for derivative asylum, which USCIS ignored. The final three children's files remain pending at the U.S. embassy in Cameroon; Ms. Ngassam and her counsel have refrained from advising those children to proceed with further visa processing because they have not received any assurance from the embassy and USCIS that Ms. Ngassam's material evidence would be considered in those children's cases. Without such assurance, Ms. Ngassam fears that those three petitions will also be reopened and denied.

**The Refugee/Asylee-Relative Petitioning Process (Form I-730)**

27) An underlying principle of immigration law is the importance of maintaining family unity.

28) That policy is particularly significant with respect to torture survivors. Congress has recognized that "[b]y acting to heal the survivors of torture and protect their families,

7

the United States can help to heal the effects of torture and prevent its use around the world." Pub. L. No. 105-320, § 2(8), 112 Stat. 3016 (1998).

29) Individuals granted asylum protection in the United States are eligible to be reunited with their spouses and unmarried children under the age of 21. 8 C.F.R. § 208.21(a). Those qualifying family members are granted asylum as derivatives, meaning they only need to show a qualifying relationship to the principal asylee to be awarded asylum themselves. Id.

30) The asylee initiates the process of bringing family members to join her in the United States by filing a form I-730 asylee-relative petition with the Nebraska Service Center within two years of the grant of asylum. 8 U.S.C.A. § 1158(b)(3); 8 C.F.R. § 208.21(d). The asylee must file "a separate Form I-730 for each qualifying family member . . . ." 8 C.F.R. § 208.21(d).

31) Qualifying asylee-relative children must meet the definition of "child," which, under 8 U.S.C.A. § 1101(b)(1), requires that they be an "unmarried person under twenty-one years of age."

32) The immigration regulations provide that asylees seeking to reunite with their children, "[w]here possible" should submit certain documentary proof establishing the claimed relationship. 8 C.F.R. § 208.21(f).

33) Pursuant to the regulations, the immigration service considers a "birth certificate of the child showing the mother's name" to be "primary evidence" of the child's eligibility for derivative asylum. 8 C.F.R. § 204.2(d)(2)(i).

34) In lieu of a birth-certificate, the agency also accepts secondary evidence, which may include medical records, school records, religious documents, or affidavits. 8 C.F.R. § 204.2(d)(2)(v).

35) When other forms of evidence have proven inconclusive, the director may require blood tests to establish a parent-child relationship. 8 C.F.R. § 204.2(d)(2)(v)(i).

36) Applicable regulation 8 C.F.R. § 103.2(b)(8) provides that "[w]here there is no evidence of ineligibility . . . or the Service finds that the evidence submitted either does not fully establish eligibility for the requested benefit or raises underlying questions regarding eligibility, the Service shall request the missing initial evidence . . . ."

37) Applicable regulation 8 C.F.R. § 103.2(b)(16)(i) provides that petitioners "shall be advised" of an adverse conclusion by USCIS "of which the applicant or petitioner is unaware" and "offered the opportunity to rebut the information and present information in his/her own behalf before the decision is rendered."

38) Once an I-730 Asylee-Relative Petition is approved by USCIS, the approved petition is forwarded by the service center to the U.S. Embassy or Consulate abroad where the asylee's relatives are located. 8 C.F.R. § 1208.21(d).

39) At that point, the family member-beneficiary must apply for a visa at the appropriate foreign embassy, which will then proceed with visa processing.

**Processing of Plaintiff's I-730 Petitions**

40) When Ms. Ngassam filed her seven I-730 petitions with the Nebraska Service Center
on September 15, 2003, she submitted what she believed were the children's birth
certificates as proof of her children's eligibility for asylee-relative status.[5]

41) Between September 2004 and April 2005, the Plaintiff's I-730 petitions were then
transferred by the agency between a variety of offices and service centers between
Nebraska, New Jersey, and Missouri without being processed.[6]

42) Counsel for Ms. Ngassam received notice that USCIS had transferred the petitions to
the Newark Asylum Office. On information and belief that action was taken under a
short-lived, now defunct pilot program that only served to prolong Ms. Ngassam's
reunification with her children. See Ex. 4, Condon Aff. ¶ 9.

43) Plaintiff's counsel finally implored the help of the Director of the Newark Asylum
office, who located and transferred the petitions back to the Nebraska Service Center
of USCIS. See id. at ¶ 10-11; Exhibit 6, Letter from Plaintiff's Counsel, April 4,
2005.

44) On May 12, 2005, the agency finally approved six of Ms. Ngassam's petitions, nearly
two years after Ms. Ngassam had filed them.[7]

45) On August 12, 2005, Ms. Ngassam's children appeared for visa interviews at the U.S.
Embassy in Yaonde, Cameroon. See Ex. 4, Condon Aff. ¶ 12. At that time, the
embassy discovered a problem with the birth certificates submitted in support of Ms.

---

[5] See Exhibit 10, Supplemental Affidavit of Rose Ngassam Submitted to USCIS for the
first time February 1, 2006; Ex. 3, Ngassam Preliminary Injunction Aff.
[6] See Exhibit 4, Affidavit of Jenny-Brooke Condon, Esq. in Support of Preliminary
Injunction, at ¶ 8.
[7] The final petition was approved on September 22, 2005. See Ex. 4, Condon Aff. ¶ 11;
Exhibit 7, I-797 Notice of Approvals.

Ngassam's I-730 petitions. See id. at 13; see Exhibit 8, Borderies Email, Nov. 18, 2005.

46) After counsel's further inquiry, Pauline N. Borderies, an official at the U.S. Embassy in Cameroon, stated in an email that on November 18, 2005, the embassy returned the children's files to USCIS's Nebraska Service Center with a recommendation that the approved petitions be revoked.[8] Counsel later discovered that information was false.[9] The embassy did not return the files to USCIS until eight months later in June 2006.[10]

47) When Ms. Ngassam learned in November 2005 that there was a problem with the birth certificates submitted in support of her petitions, she was shocked. In 2003, when Ms. Ngassam filed her asylee-relative petitions, she asked her family in Cameroon to send her attorneys the children's birth certificates, which were in the possession of her abusive husband.[11]

48) Ms. Ngassam's family sent the documents directly to counsel. Ms. Ngassam never scrutinized the birth certificates, nor had any reason to think they were not the children's birth certificates that she left behind in Cameroon when she fled. Ex. 10, Ngassam Supp. Aff. Feb. 1, 2006 ¶ 11.

49) When Ms. Ngassam later learned there was a problem with the certificates, she called her family in Cameroon to find out what had happened. Id. at ¶ 14. She now believes that her abusive spouse provided her children with faulty documents in a deliberate attempt to harm her children and cause problems for her in the United States. Id. at ¶ 12.

---

[8] See Ex. 4, Condon Aff. ¶ 14; See Ex. 8, Borderies Email, Nov. 18, 2005.
[9] See Ex. 4, Condon Aff. ¶ 15.
[10] See Exhibit 9, USCIS Electronic Case Status Information.
[11] See Ex. 10, Ngassam Supp. Aff. Feb. 1, 2006 ¶¶ 9, 11.

50) She then asked her brother John Mangwa to help her children obtain official certified copies of the children's actual birth certificates. Id. at ¶ 14.

51) Counsel immediately wrote to USCIS and informed the agency of Ms. Ngassam's belief that her abusive husband in Cameroon provided her children with fraudulent birth certificates in an effort to sabotage her efforts at reunification.[12] Counsel explained that Ms. Ngassam was working to obtain official copies of the birth certificates and made clear that Ms. Ngassam was withdrawing reliance on the copies provided by her husband. The letter also made clear that the agency should expect a supplemental submission of additional proof to establish the children's eligibility for asylee-relative status. Ex. 11, Nov. 18, 2005 Letter from Condon.

52) Ms. Ngassam then immediately asked her brother to help her children obtain their actual birth certificates.[13]

53) With Ms. Ngassam's brother's help, her son ultimately obtained certified official duplicates of the children's birth certificates from the local authorities in Cameroon. As soon as counsel reviewed those documents and took steps to verify their reliability, the official copies were submitted to USCIS.[14]

54) Counsel made clear in a cover letter that the supplemental submission contained "newly obtained documentation verifying the relationship between Ms. Ngassam and her children: certified duplicates of the children's official birth certificates," and attached the official duplicates as exhibits. See Ex. 12, Feb. 1, 2006 Letter from

---

[12] See Exhibit 11, Letter from Jenny-Brooke Condon, Esq. Nov. 18, 2005.
[13] See Ex. 10, Ngassam Supp. Aff. Feb. 1, 2006 ¶ 14.
[14] See Exhibit 12, Letter from Susan Hallander & Lori Nessel, Esq., Feb. 1, 2006.

Hallander & Nessel; see Exhibit 26, Official Certified Duplicates of Birth Certificates.

55) The February, 2006 submission also included an affidavit from Ms. Ngassam which explained her abusive estranged husband's involvement in obtaining the first, apparently fraudulent set of birth-certificates. See Ex. 10, Ngassam Supp. Aff. Feb. 1, 2006. She explained how her estranged husband is still very angry and resentful of her status in the United States and detailed how she and her family subsequently obtained the official duplicates of the children's birth certificates. Id.

56) Counsel for Ms. Ngassam did not receive a timely acknowledgment of that submission from USCIS. Accordingly, one month later on March 1, 2006, counsel sent a written request to USCIS seeking an update and acknowledgment of receipt.[15]

57) That letter again enumerated the supplemental evidence submitted in support of Ms. Ngassam's petition. Ex. 13, Mar. 1, 2006 Letter from Hallander. Counsel noted, "[w]e have not yet received a receipt notice acknowledging that your office received this documentation." Id. USCIS did not respond. Ex. 4, Condon Aff. ¶ 40.

58) Approximately three months after filing the supplemental documentation, on April 25, 2006, counsel submitted a second written request seeking an update on the case with the subject line: "URGENT REQUEST for Update/Confirmation that additional documents have been received and processed."[16]

59) That letter again enumerated the supplemental evidence submitted in Ms. Ngassam's case. Ex. 14, April 25, 2006 Letter from Hallander. Counsel also included an Express Mail receipt indicating that USCIS had received the February 1, 2006

---

[15] See Exhibit 13, Letter from Susan Hallander, Legal Intern, March 1, 2006.
[16] See Exhibit 14, Letter from Susan Hallander, Legal Intern, April 25, 2006.

submission containing the birth certificates. Counsel noted that it had received conflicting information about whether the files had been returned to the NSC for processing. Id. (noting that the embassy notified Ms. Ngassam's attorneys that the files were returned to the NSC in November 2005, but that another email sent on February 2, 2006 stated that the file would be returned to the United States by the end of the month). Counsel expressed serious concern that Ms. Ngassam's case was not being addressed and requested "assurance that the new documentation has not been lost, that is has been incorporated into her file, and that it is being processed." Id.

60) On May 2, 2006, USCIS returned to counsel the entire February 1, 2006 supplemental submission of birth certificates and Ms. Ngassam's affidavit. A cursory cover letter noted that "NSC approved these petitions on 5/12/05 and has not received them back from the embassy."[17] Without taking any steps to confer with the embassy about the case or determine the relevance of Ms. Ngassam's supplemental evidence, USCIS noted "[y]ou will need to get a letter from the embassy stating when they sent these petitions back to NSC so the records can be checked further." Ex. 15, May 2, 2006 Letter from Christian.

61) Counsel attempted to do so and received an email from the embassy stating the embassy returned the files to USCIS in March 2006. The embassy arbitrarily refused to provide greater detail about why they had misled counsel about the return of the petitions in November 2005.[18]

---

[17] See Exhibit 15, Letter from Gregory W. Christian, Acting Director NSC, May 2, 2006.
[18] See Exhibit 16, Email from Pauline Borderies, U.S. Embassy in Cameroon, May 16, 2006.

62) The following month, counsel received confirmation that USCIS had received and was reviewing the above-referenced petitions.[19]

63) Counsel immediately resubmitted the supplemental evidence in support of Ms. Ngassam's case to USCIS, including the official certified duplicates of the birth certificates and Ms. Ngassam's affidavit.[20]   Counsel included electronic confirmation that the petitions were in the custody of USCIS and noted that although USCIS "recently returned these materials" to counsel's office, "[t]he enclosed documents are highly relevant to Ms. Ngassam's right to reunite with her children. We are, therefore, resubmitting them and requesting your attention to this urgent matter." Ex. 18, June 12, 2006 Letter from Condon.

64) Concerned by USCIS's disregard of the supplemental primary evidence submitted in support of Ms. Ngassam's petition, counsel resolved to supplement the record further with DNA evidence to expedite reunification. See Ex. 4, Condon Aff. ¶ 32.

65) In the summer of 2006, counsel raised money through private donations to secure DNA testing for four of Ms. Ngassam's children, including the three son's whose petitions were returned to USCIS. Id. at ¶ 33. Counsel requested that a supervisor be assigned to the case because of its complicated history so that any concerns could be addressed. Id. at ¶ 34-35.

66) A NSC supervisor never contacted Ms. Ngssam's counsel or advised them of any concerns in Ms. Ngassam's case, other than those regarding the initially submitted suspect birth certificates. Id. at ¶ 36. The only information regarding the government's concern with the case was provided from the embassy, which suggested

---

[19] See Exhibit 17, Electronic Case Status Update, June 6, 2006.
[20] See Exhibit 18, Letter from Jenny-Brooke Condon, Esq., June 12, 2006.

15

that the identity of the children and their relationship with Ms. Ngassam was in question because the initially submitted birth certificates were subsequently deemed fraudulent. Id. NSC never advised Ms. Ngassam that the certified duplicates of her children's birth certificates were insufficient to resolve the embassy's concerns or that other issues, such as the age of the children, needed to be addressed through evidence other than the certified duplicates of the birth certificates. Id. at ¶ 37.

67) In October 2006, Ms. Ngassam's counsel received the DNA test results proving unequivocally (to a scientific certainty) that Ms. Ngassam is the biological mother of her children. Id. at ¶ 38. Immediately, counsel submitted a letter and copy of the DNA test results to USCIS.[21] That letter again referenced the previously submitted supplemental documentation submitted in February 2006, and noted that, to date, counsel had not received any information regarding USCIS's review of the case. See Ex. 19, Oct. 25, 2006 Letter from Farrell & Speece. The letter also noted that the test results were forwarded to the U.S. embassy in Cameroon and, as a result, Ms. Ngassam's oldest son, Kamwa Achille Martial, received a VISA and was subsequently reunited with his mother in the United States. Id. For reasons that are unclear, the other three children with DNA test results were left behind.

68) Counsel learned by electronic notification in January 2007 that USCIS reopened three of Ms. Ngassam's petitions for reconsideration.[22] Counsel immediately wrote to

---

[21] See Exhibit 19, Letter from Legal Interns Jeremy Farrell and Lyndsay Speece, October 25, 2006.

[22] The three children whose petitions were reopened and later denied are Brice Marius Teumen, date of birth May 10, 1987, age 20; Duclo Romuald Biakop, date of birth June 22, 1989, age 18; Pegui William Tchaptchep, date of birth April 6, 1990, age 17. The other three children who remain in Cameroon are Yannou Robertine, date of birth January 1, 1985, age 22; Junior Wimga, date of birth April 6, 1990, age 17; and Teumen

USCIS and submitted a sealed copy of the DNA tests results.[23] Counsel did not rely solely on the DNA test results as evidence that the petitions should be approved; significantly, counsel again referenced the supplemental documentation—specifically the certified duplicates of the birth certificates and Ms. Ngassam's affidavit— that had been submitted to USCIS on multiple occasions over the previous year. See Ex. 20, Feb. 5, 2007 Letter from Yassine & Dehaene.

69) USCIS then issued an Intent to Deny the three subject petitions, dated January 26, 2007.[24] The Intent to Deny did not mention a need to address evidence of the children-beneficiaries' age through evidence other than the already submitted birth certificates. It only stated "[t]he consulate in Yaonde, Cameroon, returned your petition to the Service, indicating that the documentation submitted in support of the petition was fraudulent. The claimed relationship does not appear to exist." Ex. 21, Notice of Intent to Deny.

70) The Intent to Deny also included a memo from Pauline N. Borderies, Vice Consul of the U.S. Embassy in Cameroon, addressed to USCIS Nebraska Service Center and dated March 9, 2006. That memo noted that during the visa interviews for the three children whose petitions were subsequently denied, the embassy determined that the documents submitted by the children "were not definitive enough to establish a bona-fide relationship with the petitioner" and that "the birth certificates submitted by the beneficiaries are not genuine." Id. Although the embassy memo mentioned that the

---

Jackson Miguel, June 5, 1988, age 19. Ms. Ngassam has two sets of twins—her oldest children and her youngest. See Ex. 26, Official Certified Duplicates of Birth Certificates.
[23] See Exhibit 20, Letter from Legal Interns Lauren Yassine and Philippe Dehaene, February 5, 2007.
[24] See Exhibit 21, Notice of Intent to Deny.

birth certificates were investigated because the children appeared to be older than the age claimed in the petitions, the memo emphasized the inadequacy of the birth certificates to establish the identity of Ms. Ngassam's children, and as a result their eligibility for asylee-relative status.

71) In response to the Intent to Deny, Ms. Ngassam's counsel submitted a written response to reiterate the new evidence submitted in support of Ms. Ngassam's petition.[25] Counsel's response highlighted how Ms. Ngassam's Affidavit explained her efforts "upon learning of the problem," to "subsequently obtain[] duplicates of her children's official birth certificates from Cameroon, and provide[] them to the embassy and USCIS." The letter made clear that Ms. Ngassam provided DNA evidence, in addition to the certified duplicate copies of the birth certificates, to eliminate any chance that USCIS would still have concerns about the nature of her relationship with the children. Ex. 22, Feb. 16, 2007 Letter from Yassine & Dehaene.

72) Counsel also requested that the DNA testing service provide a sealed copy of the DNA test results directly to USCIS, which it did.

73) On May 7, 2007, Ms. Ngassam received USCIS's denial of the three reopened I-730 petitions.[26] The Decision acknowledged the DNA test results submitted by Ms. Ngassam, but failed to cite to Ms. Ngassam's Affidavit and the corrected certified duplicates of the birth certificates in listing the evidence she submitted in support of her petition. Ex. 23, April 30, 2007 Decisions, at 1.

---

[25] See Exhibit 22, Letter from Legal Interns Lauren Yassine and Philippe Dehaene, February 16, 2007.
[26] See Exhibit 23, Decisions, dated April 30, 2007 [hereinafter "Decision"]; Exhibit 20, Certification of Paralegal Jessica Snyder Certifying Date of Receipt of Decisions.

74) Yet those are precisely the pieces of evidence that Ms. Ngassam relied on and highlighted to rebut the agency's Intent to Deny in support of her petition in roughly eight separate communications with USCIS. Thus, the accompanying explanation in the Decision was inconsistent with the evidence submitted.

75) In spite of Ms. Ngassam and counsel's repeated attempts to urge the Service to consider the corrected certified official duplicate birth certificates, NSC wholly ignored this evidence and did not discuss its significance in the decision.

76) Instead, relying solely on the original fraudulent birth certificates provided by Ms. Ngassam's abusive husband, the agency concluded that, "the age and marital status of the claimed beneficiary has not been established, and [Ms. Ngassam has] not proven that the beneficiary is eligible for the benefit sought." Id. Further, in reaching the same conclusion, the agency also relied on the earlier consular memo, which stated that the embassy was "unable to confirm that the beneficiaries named in [the] approved petition even existed." However, the agency itself admitted in the very same decision that "the results of the DNA testing facility [prove Ms. Ngassam's] biological parentage of the children." Id. Thus, although counsel made repeated efforts to ensure that the agency possessed the corrected evidence, the agency's decision did not bear any relationship to the evidence in the record.

## Ms. Ngassam and Her Children Will Suffer Severe and Irreparable Harm If Their Separation Persists

77) As a direct and proximate result of Defendants' wrongful conduct, the Plaintiff has experienced a "deep decline in [her] emotional and physical functioning."[27] Ms.

---

[27] See Ex. 5, Kahn Aff. ¶ 14.

Ngassam will be further irreparably harmed if immediate action is not taken to correct the agency's unlawful and arbitrary action.

78) According to a recent psychological evaluation, Ms. Ngassam's "current psychological condition can best be described as markedly fragile." Id. ¶ 10. The prolonged separation from her children has caused severe psychological trauma to Ms. Ngassam that is at "significant risk of worsening" in light of the denial of her children's petitions. Id. According to that evaluation, the agency's denial has left Ms. Ngassam in a "precarious psychological state, with very little in the way of internal coping resources, placing her at risk for further decline." Id. at ¶ 14.

79) As a result of her initial trauma and torture in Cameroon and the prolonged delay in reunification with her children, Ms. Ngassam suffers from a number of symptoms "consistent with severe clinical depression" and suffers from Major Depressive Disorder. Id. She experiences "profound grief, guilt, and shame in not being able to parent and protect her children." Id. at ¶ 12.

80) Her "psychological distress is also being manifested in physical symptoms," including "considerable difficulty sleeping," "frequent nightmares involving the death of her children," headaches, appetite changes, and fatigue. Id. at ¶ 11.

81) Ms. Ngassam's psychological evaluator concluded that "Ms. Ngassam cannot psychologically tolerate further delay in reunification with her children . . . with each day she sinks further into despair. Ms. Ngassam is at risk of further psychological and physical decline, up to and including suicidality." Id. at ¶ 15.

82) As a result, Ms. Ngassam was recently referred for "individual psychotherapy for treatment of depression and trauma, and for psychiatric/medication evaluation for treatment of severe depression and to monitor the level of suicide risk." Id.

83) In addition, Ms. Ngassam has reason to believe that her family remains in grave danger which has contributed to her severe anxiety and distress. Since she fled Cameroon, the police have arrested and abused several of her relatives. Ex. 3, Ngassam Preliminary Injunction Aff. ¶¶ 13-16, 45-47.

84) Moreover, since Ms. Ngassam fled Cameroon, two of her family members were killed. Id. at ¶27-40. Ms. Ngassam believes that her brother-in-law was killed shortly after she fled Cameroon. Then, last Spring, Ms. Ngassam learned about the death of her brother, as well. Although Ms. Ngassam does not know many of the details surrounding her brother's death because her family members have sought to limit her distress by not telling her many of the details, what she does know has increased her anxiety, distress, and guilt. Id. at ¶¶34-38. Shortly before his death, Ms. Ngassam's brother, who had been watching over her children, expressed a fear of death and a desire that Ms. Ngassam's children leave Cameroon immediately. Id. Although he did not explain to Ms. Ngassam the basis for his fear, shortly thereafter, she learned that her brother was shot and killed. Id. at ¶¶38-40. She subsequently obtained a death certificate from her family members in Cameroon verifying that he died from unnatural causes, specifically "head trauma."[28]

85) Finally, Ms. Ngassam recently learned from a nephew who lives in Germany that armed men wearing camouflage attacked some of her children at her family home in

---

[28] Exhibit 24, Death Certificate of Jean Mangwa.

Douala.[29]  Three men raped Ms. Ngassam's daughter Robertine while fighting off her brother Duclo, who tried to come to her aid.  Ex. 3, Ngassam Preliminary Injunction Aff. ¶¶ 45-46; see Exhibit 25, Medical Records of Yannou Robertine and Biakop Duclo.

## Ms. Ngassam Has No Administrative Remedy

86) USCIS informed Ms. Ngassam in its decision denying her petitions "that no appeal may be taken from this decision."  That statement is consistent with the agency's regulations.  8 C.F.R. § 208.21(e) (stating that "[n]o appeal shall lie from [a] decision" as to an asylee-relative petition).

87) It has been almost five years since Ms. Ngassam has been separated from her children, which began because of her torture and imprisonment in Cameroon and has continued due to unnecessary, arbitrary, and unlawful agency delay.

88) The delay in the family's reunification persists, in spite of the fact that conclusive DNA evidence proves Ms. Ngassam's maternal relationship to her children and the existence of primary evidence confirming the children's identity and age.  Ms. Ngassam commences the instant action seeking reversal of the agency's arbitrary and unreasonable decision that is contrary to the weight of the evidence and due process of law.  Ms. Ngassam seeks preliminary and permanent injunctive relief compelling the named government agencies to comply with the law governing derivative asylum, and accordingly, to grant the three asylee-relative petitions reopened and revoked by USCIS.  She further seeks an order compelling USCIS to facilitate the expeditious

---

[29] Ex. 3, Ngassam Preliminary Injunction Aff. ¶ 46.

visa processing of all of her children's visas and prompt reunification with all six of her children who remain in Cameroon.

CLAIMS

COUNT I
**Administrative Procedures Act**
**5 U.S.C. §§ 706 (1) & (2)(A); (2)(B); (2)(D)**

89) Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

90) By ignoring the children's birth certificates and Plaintiff's explanation for the initial discrepancy, the agency failed to consider highly probative evidence establishing the beneficiary-children's eligibility for asylee-relative status, and, therefore, unlawfully withheld and unreasonably delayed Ms. Ngassam reunification with her children in violation of § 706(1) of the APA. Accordingly, this Court may compel the agency to grant Ms. Ngassam's petitions and order the reunification of her family.

91) The agency's decision should be held unlawful and set aside for the following reasons:

a) The agency's repeated, unnecessary delays in Ms. Ngassam's case, the failure to take timely action on supplemental evidence submitted by Ms. Ngassam, and the failure to consider primary evidence of her children's eligibility for asylee-relative status constitute arbitrary and capricious agency action, not in accordance with the law in violation of § 706(2)(A) of the APA.

b) Such arbitrary agency action was contrary to Ms. Ngassam's constitutional due process rights in violation of § 706(2)(B) of the APA.

c) By failing to consider "primary evidence" of the children's eligibility for asylee-relative status as required by 8 C.F.R. § 204.2(d)(2)(i) and failing to provide Ms. Ngassam with the opportunity, if necessary, to "rebut" a conclusion related to that evidence, as provided for in 8 C.F.R. § 103.2(b)(16)(i), the agency did not comply with its own regulations and procedure required by law in violation of § 706(2)(D) of the APA.

Accordingly, this Court may hold unlawful and set aside the agency's findings and conclusions that Ms. Ngassam has not established her children's eligibility for asylee-relative status by a preponderance of the evidence. This Court may also set aside the agency's arbitrary decision denying her reunification with three of her children.

## COUNT II
### Violation of the INA and Its Implementing Regulations
### INA § 208(b)(3); 8 U.S.C.A. § 1158(b)(3); 8 C.F.R. § 208.21(a), (d).

92) Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

93) Defendants violated section 208(b) of the Immigration and Nationality Act, which provides for reunification of children with asylee-parents where the petitioner submits competent proof of her beneficiaries' eligibility for that benefit. See 8 U.S.C.A. § 1158(b)(3), INA section 208 (b)(2) (permitting children "of an alien who is granted asylum . . . [to] be granted the same status as the alien if accompanying, or following to join, such alien").

94) Defendants further violated the corresponding agency regulations, 8 C.F.R. §§ 208.21, 204.2, which provide the process and eligibility requirements by which

24

asylee-parents may petition for children abroad, and specifically 8 C.F.R. § 204.2(d)(2)(i), which states that birth certificates are considered "primary evidence" in support of a "petition for child or son or daughter."

95) By failing to analyze and make a decision based on the official certified duplicates of the birth certificates submitted by Ms. Ngassam, Defendants denied Ms. Ngassam the right to rebut and respond to a determination regarding the competency of that primary evidence to prove her children's age in violation of 8 C.F.R. § 103.2(b)(16)(i), and 8 C.F.R. § 103.2(b)(2)(i). In addition, by failing to mention Ms. Ngassam's affidavit or the certified copies of the birth certificates, the agency violated 8 C.F.R. § 103.2(16)(i) (requiring that "[a]ny explanation, rebuttal, or information presented by or in behalf of the applicant or petitioner shall be included in the record of proceeding").

## COUNT III
### Mandamus Action
### 28 U.S.C.A. § 1361

96) Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

97) Defendants are charged with administering and implementing the Immigration and Nationality Act. Pursuant to the INA, Defendants bear sole responsibility for determining the eligibility of asylees to reunite with family members abroad as derivative asylees. Defendants' failure to lawfully discharge their statutory obligations has severely injured Plaintiff, a torture survivor who has been separated from her children for five years.

98) As a direct and proximate result of Defendants' wrongful conduct, the Plaintiff will be irreparably harmed because she will be unable to reunite with her children without once again subjecting herself to torture and imprisonment by returning to her former home of Cameroon.

99) Defendants should be compelled to perform the duty owed to Plaintiffs and approve her asylee-relative petitions based on the primary evidence of her children's eligibility for the benefit, which the agency ignored.

## COUNT IV
### Fifth Amendment of U.S. Constitution
### U.S. Const., Amdt. 5

100)    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

101)    Defendant's acts violated Plaintiff's Fifth Amendment substantive and procedural due process rights under the U.S. Constitution.

102)    Ms. Ngassam submitted several supplemental submissions and correspondence to the agency in an effort to resolve inconsistencies, prevent confusion, and avoid unnecessary delay. USICS, however, consistently failed to respond and finally issued a decision that ignored that material evidence.  By arbitrarily failing to consider key evidence submitted by Ms. Ngassam to supplement the record in support of her petition, and denying her the right to rebut and respond to a conclusion regarding that evidence, USCIS's cursory analysis of Ms. Ngassam's case violated her right to procedural due process.

103)    Those procedural due process violations arbitrarily separated Ms. Ngassam from her biological children in violation of her substantive due process rights to family

unity. The Supreme Court has consistently recognized the constitutional significance of the right to family unity and has defended the parent-child relationship from intrusion. Given the important nature of the interests at issue in Ms. Ngassam's case, the failure of the agency to consider primary evidence of Ms. Ngassam's right to reunify with her children violated her substantive due process rights.

**COUNT V**
**Declaratory Judgment Act**
Declaratory Relief Pursuant to 28 U.S.C. § 2201

104)    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

105)    By ignoring highly material evidence relevant to the beneficiary-children's right to reunite with their mother, the agency violated Plaintiff's constitutional due process rights, the INA, and the APA, and Plaintiff seeks a declaration to that effect.

106)    Given the substantial evidence submitted in this case, Plaintiff is entitled to a declaration that her children are eligible for, and should be granted, Asylee Relative Status under 8 C.F.R. § 208.21.

**COUNT VI**
**Equal Access to Justice Act**

107)    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

108)    If she prevails, Plaintiff will seek attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), as amended, 5 U.S.C.A. § 504 and 28 U.S.C.A. § 2412.

109)    This Court has jurisdiction over the parties and the action.

27

110)    This is a civil action against the United States not sounding in tort and seeking

among other things, judicial review of agency action.

111)    The position of the United States and its officers and agencies was not

substantially justified under the EAJA. 28 U.S.C. § 2412(d)(1)(B) because the

Defendants' actions were arbitrary, capricious, in violation of their own promulgated

regulations, and contrary to the INA and Ms. Ngassam's Due Process Rights. Thus,

if Plaintiff prevails in this action, she will be entitled to receive an award of

reasonable attorneys' fees and costs under the EAJA. 28 U.S.C. § 2412(d)(1)(B),

(2)(H).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully asks the Court to:

1.    Assume jurisdiction over this matter;

2.    Declare that Defendants' actions violated the Fifth Amendment to the U.S.

Constitution, the Immigration and Nationality Act, and regulations enacted

thereunder, and the Administrative Procedures Act; and hold unlawful and set

aside the agency's decision denying Ms. Ngassam's children asylee-relative

status;

3.    Declare that Plaintiff's children are eligible for, and should be granted, Asylee

Relative Status under 8 C.F.R. § 208.21.

4.    Order the agency to grant Plaintiff's three revoked asylee-relative petitions based

on the primary evidence of eligibility submitted by Plaintiff;

5.  Order USCIS to facilitate the expeditious visa processing of all of her children's visas and prompt reunification with all six of her children who remain in Cameroon.

6.  Award Plaintiff's counsel reasonable attorney's fees and costs; and retain jurisdiction of this case and the parties for review purposes; and

7.  Grant such other and further relief as may be just and proper.

Dated:  September 18, 2007
        New York, New York

Center for Social Justice
Seton Hall Law School

By: _____
Bryan Lonegan (B5985)
Jenny-Brooke Condon (JC7636)
Jisun Chang (student intern)
Gal Davidovitch (student intern)

Attorneys for Plaintiff
Rose Ngassam
833 McCarter Highway
Newark, NJ 07102
(973) 642-8700

29