# EXHIBIT 1



RECEIVED
JUN 1 3 2003

**U.S. Department of Justice**
Immigration and Naturalization Service

*Newark Asylum Office*
*1200 Wall Street West, 4th Floor*
*Lyndhurst, NJ 07071*

June 3, 2003
A 96261832

Rose Ngassam Amougou
C/O Franklin Women Shelter
1122 Franklin Ave.
Bronx, NY 10456

## Asylum Approval

Dear Ms. Ngassam:

This letter refers to your request for asylum in the United States filed on Form I-589.

It has been determined that you are eligible for asylum in the United States. Attached please find a completed Form I-94, Arrival-Departure Record, indicating that you have been granted asylum status in the United States pursuant to § 208(a) of the Immigration and Nationality Act (INA) as of June 3, 2003. This grant of asylum includes your dependents listed above who are present in the United States, who were included in your asylum application, and for whom you have established a qualifying relationship by a preponderance of evidence.

You have been granted asylum in the United States for an indefinite period; however, asylum status does not give you the right to remain permanently in the United States. Asylum status may be terminated if you no longer have a well-founded fear of persecution because of a fundamental change in circumstances, you have obtained protection from another country, or you have committed certain crimes or engaged in other activity that makes you ineligible to retain asylum status in the United States. See INA § 208(c)(2).

Now that you are an asylee, you may apply for certain benefits, which are listed below. You are also responsible for complying with certain laws and regulations, if such laws and regulations apply to you. These responsibilities are also explained in this letter. We recommend that you retain the original of this letter as proof of your status and that you submit copies of this letter when applying for any of the benefits or services listed below. You may obtain any of the INS forms mentioned in this letter by visiting an INS district office or by calling the INS forms request line at 1-800-870-3676. You may also download any INS form from the Internet on the INS website at http://www.ins.usdoj.gov.

**Benefits**

1.    Employment Authorization

You are authorized to work in the United States for as long as you remain in asylum status. Your dependents listed above are also authorized to work in the United States, so long as they retain derivative asylum status. In order to work in the United States, every employee must show to a prospective employer certain documentation as proof of employment authorization. That proof may consist of, among other things, an unrestricted social security card and a state-issued driver's license. It may also consist of an unexpired employment authorization document issued by INS. For a list of all documents that can be accepted by an employer as proof of employment authorization, consult the INS Form I-9, *Employment Eligibility Verification,* available on the INS web site at www.ins.usdoj.gov/graphics/formsfee/forms/i-9.htm.

You and any qualifying dependents are each entitled to immediately receive an employment authorization document issued by INS. Please see the attached sheet entitled "Notice Regarding Employment Authorization Documentation" to find out how you can receive your employment authorization document.

2.    Derivative Asylum Status

You may request derivative asylum status for any spouse or child (unmarried and under 21 years of age) who is not included in this decision and with whom you have a qualifying relationship, whether or not that spouse or child is in the United States. To request derivative asylum status, you must submit a Form I-730, *Refugee and Asylee Relative Petition,* to the Nebraska Service Center, P.O. Box 87730, Lincoln, NE 68501-7730. **The Form I-730 must be filed for each qualifying family member within 2 years of the date you were granted asylum status,** unless the INS determines that this time period should be extended for humanitarian reasons.

3.    Social Security Cards

You may immediately apply for an unrestricted Social Security card at any Social Security office. To get an *Application for a Social Security Card* (Form SS-5) or to get more information about applying for a Social Security card use http://www.ssa.gov on the Internet, call the toll-free number 1-800-772-1213, or visit a local Social Security office. When you go to a Social Security office to apply for a Social Security card, you must take your I-94 card showing you have been granted asylum status. If available, you should also take some kind of photo-identity document, such as an EAD or your passport. For directions to the Social Security office nearest to you, call the SSA toll-free number or visit the website listed above.

4.    Assistance and Services through the Office of Refugee Resettlement (ORR)

You may be eligible to receive assistance and services through the Office of Refugee Resettlement (ORR). ORR funds and administers various programs, which are run by state and private, non-profit agencies throughout the U.S. The programs include cash and medical assistance, employment preparation and job placement, and English language training. Many of these programs have time-limited eligibility periods that begin from the date of your grant of asylum. Therefore, if you wish to seek assistance, it is important that you do so as soon as possible after receipt of this letter. To find out what programs are available and where to go for assistance and services in your state, **please call (800) 354-0365.** You also may sign on to the ORR website at http://www.acf.dhhs.gov/programs/orr.

5.    Employment Assistance

You are eligible to receive a variety of services under Title I of the Workforce Investment Act of 1998. Such services include job search assistance, career counseling, and occupational skills training. These and other services are available at local One-Stop Career Centers. To obtain information about the Center nearest you, please call 1-877-US2-JOBS. The information is also available on-line through America's Service Locator at http://www.servicelocator.org.

(Rev. 11/6/92)

6.    Adjustment of Status

You may apply for lawful permanent resident status under section 209(b) of the Immigration and Nationality Act after you have been physically present in the United States for a period of one year after the date you were granted asylum status. To apply for lawful permanent residence status, you must submit a separate Form I-485, Application to Register Permanent Residence or Adjust Status, for yourself and each qualifying family member to the Nebraska Service Center, P.O. Box 87485, Lincoln, Nebraska, 68501-7485.

**Responsibilities**

1.    Departing from the United States

If you, and/or your qualifying family members with derivative asylum status, plan to depart the United States, you must each obtain permission to return to the United States before you leave this country by obtaining a refugee travel document(s). A refugee travel document may be used for temporary travel abroad and is required for re-admission to the United States as an asylee. If you and/or your qualifying family members do not obtain a refugee travel document in advance of your departure, you may be unable to re-enter the United States, or you may be placed in removal proceedings before an immigration judge. You and each qualifying family member may apply for a Refugee Travel Document by each submitting a Form I-131, Application for Travel Document, with the required fee or request for fee waiver under 8 C.F.R. 103.7(c) to the Nebraska Service Center, P.O. Box 87131, Lincoln, NE 68501-7131.

2.    Changes of Address

You must notify the INS of any change of address within ten days of such change. You may obtain a Form AR-11, *Alien's Change of Address Card* at your nearest post office or INS office to comply with this requirement.

3.    Selective Service Registration

All male asylees between the ages of 18 and 26 must register for the Selective Service. To obtain information about the Selective Service and how to register, you may sign on to the Selective Service website at http://www.sss.gov or obtain a Selective Service "mail-back" registration form at your nearest post office.

**Note: Please write your full name, date of birth, and A number on any correspondence you have with the INS.**

Sincerely,

(For) Susan Raufer
Director,
Newark Asylum Office

cc: Jennifer Condon, Michelle Marose, Lori Nessel, Se
Justice, 833 McCarter Highway, Newark, NJ 07102

Enclosures: ✓ I-94 Card(s)
_____ Form I-688B, Employment Authoriz

(Rev. 11/6/02)

---

Departure Number

Immigration and
Naturalization Service
I-94
Departure Record
A96261832

Asylum Granted
Indefinitely
Pursuant to
Section 208 of
the Act
ZNK        JUN 3  2003

ZNK#   0057

14 Family Name
N g a s s a m   A m o u g o u
15 First (Given) Name
R o s e
16 Birth Date (Day/Mo/Yr)
2 5 / 0 1 / 6 2
17 Country of Citizenship
C a m e r o o n

See Other Side            ENGLISH            **STAPLE HERE**

# BUREAU OF CITIZENSHIP & IMMIGRATION SERVICES
## DEPARTMENT OF HOMELAND SECURITY
### NOTICE REGARDING EMPLOYMENT AUTHORIZATION DOCUMENTATION

Principal A 96 261 832

Dependent (s):  A _____

A _____

None

### Note: This notice is provided for your information only.
### It does not constitute proof of asylum status or employment authorization.

As an asylee, you are authorized to work in the United States for as long as you remain in asylum status. Your dependents listed on your approval letter are also authorized to work in the United States, so long as they retain derivative asylum status. In order to work in the United States, every employee must show to a prospective employer certain documentation as proof of employment authorization. That proof may consist of, among other things, an unrestricted social security card and a state-issued driver's license. It may also consist of unexpired employment authorization document issued by BCIS. For a list of all documents that can be accepted by an employer as proof of employment authorization, consult the BCIS Form I-9, *Employment Eligibility Verification*, available on the BCIS web site at: http://www.immigration.gov/graphics/formsfee/forms/i-9.htm

The following information applies to you:

—   The Asylum Office is providing you and any qualifying dependents with an I-688 B, *Employment Authorization Card*, at the time you and any qualifying dependents appear at the Asylum Office to pick up this final asylum decision. This initial card is valid for one year.

—   The I-688B, *Employment Authorization Card*, for you and any qualifying dependents is enclosed with this letter. This initial card is valid for one year.

⊠   You and any qualifying dependents are each entitled to immediately receive an I-688B, *Employment Authorization Card*, evidencing employment authorization. In order to receive this document, you and any qualifying dependents listed on your approval letter must go in person to the Asylum Office where you were interviewed with a copy of your approval letter and this notice at the following date and time(s): _Fridays 9am – 2 pm_ . This initial card is valid for one year and will be issued to you and any qualifying dependents immediately at no charge.

—   You and any qualifying dependents are each entitled to immediately receive an I-688B, *Employment Authorization Card*, evidencing employment authorization. In order to receive this document, you and any qualifying dependents listed on your approval letter must go in person to the BCIS local office where you were interviewed with a copy of your approval letter and this notice and request an Employment Authorization Card (I- 688B). For the hours of operation at your BCIS local office, you may call the BCIS National Customer Service Center at 1-800-375-5283 or visit the BCIS web site at: http://www.immigration.gov This initial card is valid for one year and will be issued to you and any qualifying dependents immediately at no charge.

—   You and any qualifying dependents were scheduled to pick up your asylum decision at the Asylum Office where you were interviewed. At that time, your photograph and fingerprints would have been taken so that the Asylum Office could issue you photo-identity document(s) evidencing employment authorization. Because you failed to return to the Asylum Office in person to pick up your asylum decision, the BCIS was unable to conduct the in-person processing required to produce the document(s). Consequently, if you wish to obtain BCIS-issued evidence of employment authorization, you and each dependent listed in your approval letter must complete and submit the enclosed Form I-765, *Application for Employment Authorization*, to the BCIS Nebraska Service Center, P.O. Box 87765, Lincoln, NE 68501-7765. You are not required to pay a fee with your initial request for an employment authorization document.

—   You and any qualifying dependents were scheduled on _____to come to the Newark Asylum Office to receive your *Employment Authorization*. At that time, your photograph and fingerprints would have been taken so that the Asylum Office could issue you photo-identity document(s) evidencing employment authorization. Because you failed to return to the Asylum Office in person, the BCIS was unable to conduct the in-person processing required to produce the document(s). Consequently, if you wish to obtain BCIS issued evidence of employment authorization, you and each dependent listed on your approval letter must complete and submit Form I- 765, *Application for Employment Authorization*, to the BCIS Nebraska Service Center, P.O. Box 87765, Lincoln, NE 68501-7765. You are not required to pay a fee with your initial request for an employment authorization document.

—   You and any qualifying dependents are each entitled to immediately receive an I-688B, *Employment Authorization Card*, evidencing employment authorization. In order to receive this document, you and any qualifying dependents must go in person to the Asylum Office where you were interviewed with a copy of this notice at the following date and time(s): _____. This initial card is valid for one year and will be issued to you and any qualifying dependents immediately at no charge.

—   You and any qualifying dependents are each entitled to immediately receive an I-688B, *Employment Authorization Card*, evidencing employment authorization. We are unable to issue you work authorization because you have moved out of our area. If you wish to obtain BCIS-issued evidence of employment authorization, you and each dependent listed in your approval letter must complete and submit the enclosed Form-I765, *Application for Employment Authorization*, to the BCIS Nebraska Service Center, P.O. Box 87765, Lincoln, NE 68501-7765. You are not required to pay a fee with your initial request for an employment authorization document.

# EXHIBIT 2

Bureau of Citizenship
And Immigration Services
NEWARK ASYLUM UNIT

_____

|  |  |
|---|---|
| | ) |
| | ) |
| In the Matter of | ) |
| | ) APPLICANT'S AFFIDAVIT IN SUPPORT OF |
| | ) HER APPLICATION FOR ASYLUM IN THE |
| Rose Ngassam | ) UNITED STATES |
| | ) |
| | ) |
| | ) |
| Applicant | ) |
| | ) |
| | ) |

I, Rose Ngassam, being duly sworn, do state:

    1.    I am 41 years of age and understand the obligation of an oath.

    2.    I am a citizen of Cameroon, where I was born and resided until I arrived in the United States on July 12, 2002. A copy of my Cameroonian passport is attached. (*See* **Exhibit A**). I make the following statements in support of my application for asylum on account of my involvement in the Social Democratic Front (SDF), the leading political opposition party in Cameroon, and my activities with a non-governmental organization, Unisson Contre le Virus (UCV), which promotes AIDS awareness in Cameroon. My fear of persecution is grounded in the severe abuse that I have suffered on account of my political activities and AIDS awareness advocacy at the hands of both the Cameroonian police and my husband, who is a member of the

1

gendarmerie. In particular, I fear returning to Cameroon because police officials continue to search for me and have recently targeted my children who I was forced to leave behind.

## MY BACKGROUND

4.      I was born on January 25, 1962 in Douala, Cameroon, and am a member of the Bamileke Tribe. (*See* map **Exhibit E**).

5.      My parents were from Bangangte in the Western region of Cameroon (*See* Map **Exhibit F**). As is common in Cameroon, my father had two wives.[1] I never knew my mother because she passed away while giving birth to me.

6.      I have 2 older sisters and 2 older brothers. After my mother died, no one could take care of me. Therefore, I was sent to an orphanage as a newborn. My brothers and sisters stayed with my father and his other wife. My father passed away about 15 years ago, but I did not have much contact with him.

7.      My sister Lydie, who was the younger of my sisters, passed away in November, 2001, after suffering a heart attack when she saw how the police had tortured me. (I will later describe each of my incarcerations in greater detail). My other siblings are still in Cameroon.

8.      I have seven children of my own, and after Lydie passed away, I also cared for her daughter as well.

9.      When I was five-years-old, one of my mother's friends removed me from the

---

[1] Polygyny (the practice of one man having more than one wife) is permitted by customary law in Cameroon but polyandry (the practice of a woman having multiple husbands) is not. *See* U.S. Dept. of State, *2002 Country Reports on Human Rights Practices, Cameroon,* 19 (Mar. 31, 2003) [hereinafter *2002 Country Reports*]. (*See* **Exhibit G** ); *see also* Webster's New Collegiate Dictionary, 891-92 (1977) (defining polygyny and polyandry). (*See* **Exhibit H**)

orphanage to take care of me. At this age, I also began school, attending St. Paul Missionary School in Douala until I was eleven. I then attended high school at College Mbamy Fochada until I was 17. During my final year of high school, I began to work while I attended school. My first job was as a doctors' assistant in the infirmary of a perfume company called Sipca.[2]

10.    It was also at age 17, that my aunt on my mother's side brought me a man to marry. Although Richard Tchatchoua and I did not formally or legally marry, we had a customary marriage. As an orphan, I did not have a choice about my future and was forced to marry a man whom I did not know and did not love. Although I was young when I got married and not ready to be a wife, I accepted the marriage because of tradition. Forced marriage is common in Cameroon and women lack power in relationships.[3]

11.    My husband and I did not get along. Towards the end of our relationship, I became pregnant, which caused further problems in our relationship. I gave birth to twins on January 1, 1985. Eventually we realized, however, that our marriage could not survive and when I was 23-years-old, my husband and I permanently separated.[4]   Because Cameroonian law did not officially recognize our marriage, we did not have to seek a formal divorce.

12.    About five years after my common law marriage ended, I changed jobs, leaving Sipca to work at a flour factory called Minoterie Fabrication Farine, where I again performed

---

[2] I worked at Sipca for approximately eleven years.
[3] In Cameroon, the minimum age for girls to marry is age 15, below the age of majority, while the age for men to marry is 18. *See* Center for Reproductive Law and Policy, *Women's Reproductive Rights in Cameroon: A Shadow Report*, 3 (1999) (noting that forced marriage of adolescent girls still occurs in Cameroon and that "both statutory law and custom discriminate against married women") [hereinafter *Shadow Report*]. (*See* **Exhibit I**); *see also 2002 Country Reports, supra* note 1, at 19 (noting the prevalence of forced marriages in Cameroon and that women are

3

work as an assistant in the infirmary, but also did housekeeping and worked with the flour machines. After working at the flour factory during the day, I started selling beer, cigarettes and other items at a kiosk to make extra money at night. During this period, I was involved in other relationships and gave birth to three of my children in 1987, 1988, and 1989.

13.    In 1990, I met my Pierre Amougou who is an ethnic Beti and a police officer known as a gendarme.[5] As a Beti, which is the ethnic group in power,[6] he has a privileged position in society.[7] In fact, he is from the same village as the current President of Cameroon, Paul Biya and, therefore, speaks Ewondo, the same language as the Biya regime.[8]

14.    One of my his functions as a member of the gendarme was to act as a chauffeur for his boss. His boss frequently sent him to meet a Lebanese friend who owned a timber

---

considered the property of their husbands in many regions).

[4] My husband and I have not had any contact since we separated.

[5] "The gendarmerie is an elite military corps which is normally assigned to law enforcement activities." United Nations, Committee against Torture, Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; *Consideration of Reports Submitted by States Parties Under Article 19 of the Convention, Cameroon* U.N. Doc. CAT/C/17/Add.22 (1999) [hereinafter *CAT Report*]. (*See* **Exhibit J**). United Nations monitoring reports have noted that members of the corrupt gendarmerie perpetrate rampant human rights abuses against citizens. *See id.* Police power in Cameroon is shared "by the national police (DGSN), the National Intelligence Service (DGRE), the Gendarmerie, the Ministry of Territorial Administration, military intelligence, the army, and to a lesser extent the Presidential Guard." *2002 Country Reports*, *supra* note 1, at 1.

[6] *2002 Country Reports*, *supra* note 1, at 17 ("Many of the key members of the Government were drawn from the President's own Bulu/Beti ethnic groups…[m]embers of some of the other 200 ethnic groups held 39 cabinet seats, compared with 16 cabinet positions held by members of the President's ethnic group."), *see also* Freedom House, *Country Survey, Cameroon* (1999) (stating that President Biya shares power only with "cronies" largely from his own Beti ethnic group) [hereinafter Freedom House]. (*See* **Exhibit K**). The CIA has noted that "[d]espite movement toward democratic reform, political power remains firmly in the hands of an ethnic oligarchy." CIA, *The World Factbook, Cameroon* (2002) [herinafter *CIA Factbook*]. (*See* **Exhibit L**).

[7] *See 2002 Country Reports*, *supra* note 6 (noting that members of the Bulu-Beti ethnic groups hold "key positions" and are "disproportionately represented in government, civil service, state-owned business, the security forces, the military, and the ruling CPDM party"); *see also* Freedom House, *supra* note 6 (noting the the Beti ethnic group "often receives preference in employment").

[8] *See* U.S. Dept. of State, *Background Note, Cameroon* (May 2002) (noting that Ewondo is the dialect of a Beti clan from the Yaounde area") [hereinafter *Background Note*]. (*See* **Exhibit M**).

4

company across the street from my kiosk. While on these errands, Pierre often stopped to buy cigarettes at my kiosk and we started to get to know one another. Pierre and I did not marry right away, but we had two children together. In 1990, I gave birth to my second set of twins, who are my youngest children.

15.    In the next few years, my small business started to grow. I began by selling cigarettes and a case or two of alcohol, but slowly built up my business. In 1996, I bought a space in Douala and established a bar/restaurant. Eventually, I ran the bar and managed a handful of employees.

16.    Pierre and I lived together first and officially married in 1998. (*See* reissued copy of marriage certificate **Exhibit C**[9]). Soon after our marriage, the gendarmerie assigned my husband to a position in Ebolowa, and provided him with a military residence there. For the duration of my husband's two-year assignment, we both traveled back and forth between Douala and Ebolowa, living intermittently at both residences.

17.    I was happy during the early part of our relationship. However, once we married, I learned of my husband's relationships with other women, including prostitutes. My husband infected me with syphilis multiple times and I was terrified of getting AIDS. I believe that members of the military and police are one of the groups most at-risk of contracting AIDS[10]

---

[9] During a fight with my husband sometime after my first incarceration, my husband tore up our marriage license. In May of 2002, I requested a reissued copy from the Cameroonian authorities. The person who filled out the marriage certificate, correctly noted my birth date. However, he or she miscalculated my age at the time I was married in 1998. The certificate states that I was age 36 at the time of my marriage. However, as my correctly noted birth date indicates, my age at that time was 33.

[10] A 1996 study revealed that 15 percent of all military personnel in Cameroon are infected with HIV, a figure just 2

because their high income from corruption allows these men to find and pay for prostitutes with impunity.

18.    My husband followed this pattern of exploiting his position of power, and had sex with many women, even in our own bed. He would often leave the house for weeks at a time and I would have no idea where he had been. Terrified of contracting HIV because of my husband's conduct, I was tested for the virus. Fortunately, I never tested positive, but continued to live in fear.

19.    While my husband never physically abused me during the early part of our relationship, once I became politically active, that all changed.

20.    For a short period of time in 1999, I joined the Cameroon People's Democratic Movement (CPDM), the political party currently in power in Cameroon.[11] I joined the CPDM because I wanted to align myself with the government in hopes that I could protect my business from being targeted by corrupt officials and others.

21.    I do not know for sure whether my husband officially joined the CPDM, as well, but because he is a gendarme, he is a government employee and automatically associated with the party. In addition, because my husband is a Beti and from the same village as the current President of Cameroon, he is strongly affiliated with the dictatorship.

---

percent lower than the infection rate for prostitutes. *See* Joint United Nations Programme on HIV/AIDS (UNAIDS), *AIDS in Africa: Country by Country, Cameroon* (2002). (*See* **Exhibit N**).
[11] While the government adopted legislation in 1990, which allows for the formation of multiple political parties, in reality the country is run and dominated by the CPDM. U.S. Dept. of State, *2001 Country Reports on Human Rights Practices* (Mar. 4, 2001) [hereinafter *2001 Country Reports*]. (*See* **Exhibit O**). In fact, the CPDM or its "predecessor parties" have ruled Cameroon since it gained its independence from France and Britain in the early

6

22.     After I joined the CPDM, however, I realized that members of this group primarily wanted to gossip and that none of them were concerned about changing the country for the better. In fact, many people joined CPDM just to align themselves with the government as a means to protect their jobs. After less than a month, I decided to leave the party for another political party, the Social Democratic Front (SDF),[12] which I saw as a party interested in real change.

23.     In January 2000, I joined the SDF, the major opposition party in Cameroon.[13] I joined SDF because I objected to the dictatorship, its corruption and disregard for the well being of the people of Cameroon. I was specifically troubled by the government constantly saying one thing but doing another. I believe that the government was not ready to help the Cameroonian people because it had no programs to address the country's problems.[14] Frustrated with the government for doing nothing, I wanted to work with others to improve Cameroon myself. I joined the SDF because it was a party interested in changing Cameroon for the better and I

---

1960s. *See Background Note, supra* note 8.

[12]   The Social Democratic Front (SDF) formed in 1990 to challenge the one-party system in Cameroon, namely the dominance of the CPDM. Among its many goals are "a just and free democratic society," private ownership, participatory democracy, respect for fundamental human rights, freedom of association, and "equality of all citizens before the law." SDF Website, *About the Social Democratic Front* at www.spfparty.org. (*See* **Exhibit P**).

[13] Opposition groups claim that SDF leader, Ni John Fru Ndi, won the 1992 Presidential election, however President Biya claimed victory by force. *See id.* The U.S. State Department notes that most observers also viewed the 1997 reelection as "neither free nor fair." *2002 Country Reports, supra* note 6, at 16 (noting that the election was "marred by serious procedural flaws as well as a boycott by the three major opposition parties").

[14] Rampant state-sanctioned human rights abuses, corruption, political oppression, and regional factionalism, gender discrimination, and a growing AIDS epidemic continue to plague Cameroon. *See generally 2001 Country Report, supra* note 11; U.S. Dept. of State, *Background Note, supra* note 8. The reported suppression of dissent and political expression as recently as March of this year underscores that Cameroon's violations of civil and political rights endure without restraint. On March 19, 2003, the communication minister closed a private radio station, Magic FM, "for running programmes critical of the government of President Paul Biya." *Cameroon: Private Radio Station Closed*, IRINEWS AFRICA, Mar. 19, 2003. (*See* **Exhibit Q**). This was the third private broadcaster closed in

agreed with their policies on how to do that.[15]

24.     Part of my involvement with SDF involved helping Fomba Gregoire, Secretary of Propaganda in Bepanda to formulate public education and outreach campaigns aimed at soliciting members and informing the public about the problems with the dictatorship. Every weekend I would get together with other members of the SDF in the quarter[16] to discuss the party and our plans. Through these meetings we would recruit members. Sometimes, if the President of SDF was in town, we would organize larger gatherings to greet him.

25.     At times, I was scared about how the government would react to my involvement with the SDF because I knew that the SDF spoke the truth about Cameroon and that the government would retaliate. But my desire to address the problems in Cameroon kept me motivated and strong.

26.     Through my work with SDF, I learned about a Non-Governmental Organization dedicated to AIDS prevention, called in Unisson Contre le Virus (UCV), which means in Unison Against the Virus. Disturbed by my husband's horrible treatment of me and his disregard for my safety, I resolved to get involved in UCV's efforts to educate Cameroonian citizens about sexually-transmitted diseases and to prevent the spread of AIDS and prostitution. While continuing to work at my bar, as well as with the SDF, early in the year 2000, I started to devote

---

a little over a month. *Id.*
[15] The SDF's policy agenda calls for revisions to the Cameroonian constitution to promote representative democracy, political reforms to ensure greater governmental accountability and respect for the rule of law, economic reforms to promote fiscal liberalism and private sector growth, increased resources spent on tourism and sports as a means of decreasing tribalism and promoting national unity, as well as increased spending on education. *See* SDF Website, *Together Let Us Change Cameroon! The SDF Platform, supra* note 12. (*See* **Exhibit R**).

8

my free time to AIDS activism.

27.    My decision to join UCV was fueled by fear for my own safety because of my husband's dangerous behavior and also by my profound concern for the growing AIDS epidemic in my country[17] and its impact on children.  Because I am the mother of five boys and saw first hand the risky behavior of men in Cameroon, I wanted to do something positive for their future.  Of the approximately 30 members of the UCV, all but three of its members are women.

28.    As a member of the UCV, I helped to organize public outreach campaigns aimed at educating at-risk groups.  A large part of our public education efforts involved distributing condoms at public rallies and forums.  Young people would come to us for advice and doctors and schools began to support and appreciate our efforts.  For example, because school is not held on Wednesday afternoons in my area of Cameroon, school officials allowed us to use their classrooms for our outreach activities.  In addition to our public education rallies and forums, the organization held regular meetings twice a month.

29.    While SDF and UCV shared common members, they are separate entities and the SDF does not fund the activities of the UCV.  Churches, schools, and private donations, not political parties, fund UCV.  The condoms that I distributed derived from European countries and the United States.

---

[16] In Cameroon towns are divided into quarters.  This is a section of the town equivalent to neighborhoods in the United States.

[17] *See* United Nations Joint Program on HIV/AIDS (UNAIDS), *AIDS Epidemic Still Growing as Anti-Disease Effort Builds* (Jul. 2, 2002) (noting the "rapidly accelerating" spread of HIV in Cameroon).  (**See Exhibit S**); *see also* Rose Mougnutou, M.D., *Treatment of HIV/AIDS by ARVs: The Experience of Cameroon* (speech delivered Jun. 21, 2001) (noting that "out of fifteen million inhabitants almost one million people in Cameroon are HIV+").  (**See**

9

30.    After I joined the UCV, my relationship with my husband deteriorated even more. My husband did not like the fact that I was working for UCV and thought that it reflected badly on him as a police officer and person affiliated with the government.

31.    My husband saw my work as a personal offense to him. In his view, my work trying to stop the spread of AIDS was an act of insolence and disobedience that was really motivated by my desire to act out against him. During arguments about my work for UCV, my husband sometimes hit me and threw objects at me, while yelling that I disrespected him through my activism. He believed that my activities publicly embarrassed him because he was in a position of responsibility as a gendarme.

32.    Even more often than he hit me, my husband would chase me out of the house and threaten to kill me. In fact, the more active I became with the UCV, the more my husband would threaten my life. I believe my husband responded this way to my activism because he wanted to oppress me. He viewed women as subordinates in marriage and my work as a challenge to his power. I believe that he also wanted to intimidate me not to criticize him or talk publicly about the dangerous behavior in which he and so many other men in Cameroon engaged.

33.    Because domestic violence against women is common in Cameroon and the law does not impose penalties for abusers, I had little recourse to escape my husband's horrible treatment.[18]

34.    In spite of my husband's abuse and threats, I never abandoned working for UCV

---

Exhibit T).
[18] *See 2001 Country Reports, supra* note 1 (noting that although domestic violence against women is pervasive in

because my work was for my own well being, as well as for my children's future. I saw how AIDS was destroying our country[19] and how the government did nothing about it. When I thought about how my husband had treated me and about the dangerous world my children lived in because of AIDS, I knew I had to continue to fight.

35.     Domestic abuse is not a grounds for divorce in Cameroon and the law even allows a husband to oppose the right of his wife to work.[20] Although my husband never tried to stop me from working in my bar, he continually tried to threaten and pressure me into stopping my other activities.

36.     Around the time of Easter in 2000, my father-in-law summoned me, my husband, and his other children to his house, after learning about my husband's involvement with other women. My husband arrived with another woman and introduced her as his second wife. My father-in-law lectured my husband on how polygamy would not be tolerated and forbid him from seeing her.

37.     After this meeting, I thought things would improve with my husband, but they only got worse. Things were so bad in my marriage, in fact, I believe that my husband no longer cared whether I lived or died; as I would soon discover, he would do nothing to protect me even from the abuse of others.

## MY FIRST IMPRISONMENT

---

Cameroon, the country "does not impose effective penalties" against men).
[19] According to one doctor working with *Doctors without Borders*, in 2000, 91,000 Cameroonian children were orphaned because of AIDS, 5,168 persons became newly effected with HIV, and 5,000 children lived with the virus. Mougnutou, *supra* note 17.

38.     Shortly after my father-in-law's lecture, on approximately May 16, 2000, I helped organize a UCV meeting in the park of a hotel in Ebolowa[21] to educate the public about the perils of unprotected sex. Like most of our public gatherings, the meeting had produced a crowd; this time about 300 people assembled including approximately 14 member of the UCV. Members of my group distributed condoms to the public and talked to the attendees about preventing the spread of AIDS and other diseases, as well as the problems of unwanted pregnancies.

39.     At around 8:00 p.m. when I was getting ready to leave, two large trucks full of police officers arrived (each truck can fit about 30-40 officers) and began to harass me and the other members of the group. About 50 armed officers dressed in police uniforms, not military dress, dispersed from the trucks. They sprayed tear gas into the crowd, which burned my throat and eyes, and shot guns into the air to scare away the crowd.

40.     The officers demanded to know who supported UCV's activities and where the organization received its funding. Insisting that we tell them the motivation behind our activities, the officers accused SDF and other political parties of funding our AIDS prevention work and kept threatening to put me and the others in jail.

41.     Even though I kept telling the officers that UCV is not affiliated with SDF and that we only wanted to help people in the community, the officers didn't care.

42.     They loaded me and three other women who were at the meeting into one of the

---

[20]  *See 2001 Country Reports, supra* note 1.
[21]  Although the Constitution provides for freedom of assembly, in reality this freedom is severely restricted by the government. The law only requires organizers to notify government officials in advance if they plan to assemble, but officials claim the Penal Code authorizes them to grant or deny permission of assembly. Police frequently break up

trucks and brought us to the police station in Ebolowa. All of us asked, why are you taking us, and the officers said we'll tell you at the jail. Because my eyes were burning from the tear gas, I am not sure how many other people the officers put in the second truck.

43.     The police knew that I was a member of the SDF because I wore both my SDF and UCV identification card around my neck in order to inform the people who attended the UCV meeting who I was and the causes I was working to promote. Even though this was a UCV function, I was still part of SDF and wanted the public to know what I believed in.

44.     I was kept in prison for about three days and was severely beaten and tortured.[22] At this time, I was six months pregnant and already wearing maternity clothing.[23]

45.     During this imprisonment, I was kept in the same cell as the three other women from the UCV meeting, along with two other women whom I did not know.

46.     When the police wanted to interrogate me and the others, they took us out of the cell and brought us to another room where officers questioned us individually. The officers forced me to sit on the ground during these sessions and continually beat me with a belt all over my body throughout the questioning.

---

small gatherings using tear gas and water. *See 2001 Country Reports, supra* note 1.

[22] Although arbitrary arrest and detention is illegal in Cameroon, security forces regularly arrest and detain citizens without cause, and without judicial hearings. *2002 Country Reports, supra* note 1, at 8. Security forces continue to target "opposition politicians, local human rights monitors, journalists, and other critics of the Government, often holding them for prolonged periods, without charges or a chance for trial and, at times, incommunicado." *Id.*

[23] Prison conditions in Cameroon are abysmal and even women and children are not spared. "Mothers are often incarcerated with their children or babies." *2001 Country Reports, supra* note 1, at 7 (noting the incarceration of one woman with her 9-month-old child). The United Nations Special Rapporteur on Torture confirmed that torture and ill treatment by the police is systematic and widespread. Detainees have claimed that they have been beaten, forced to confess and struck with machetes. Children have been forced to kneel while they are kicked and have been beaten on the soles of their feet. In very few cases are persecutors ever prosecuted. Amnesty International, *United Nations*

47.    The officers also forced me to walk on my knees on the gravel-covered ground. To this day, I still have pain in my knees and have difficulty walking sometimes. I often wake up in the middle of the night unable to sleep because of the pain in my knees and hips.

48.    During one of the interrogations, I was punched in the face and hit with a baton-like instrument in the eyes. As a result, I sustained an eye injury so severe I almost lost my sight. I was also beaten on the bottom of my feet with the flat side of a machete. The officers randomly beat me with a club and kicked me whenever they felt like it.

49.    During the interrogations, the officers constantly demanded to know what groups supported and funded UCV's work and kept accusing the SDF and other opposition political parties of backing UCV's efforts. I told the guards that European countries and the United States helped to provide us with condoms and that churches and schools supported UCV's activities, but this did not stop their torture. The officers also did not believe me when I told them that my activities were motivated by my desire to help people. One of the guards told me that I was lying and kept beating me in an effort to get me to tell the "truth."

50.    I believe that the police saw UCV's activism as an affront to its power. Because the government is ashamed of the AIDS problem, it blames political parties like SDF for trying to incite the public around the issue and cause problems for the government.

51.    Because I had my national identification card the police knew I was a Bamileke.[24] By looking at this card, they also saw my married name Amougou and recognized that my

---

*Expert Confirms that Torture is Widespread and Systematic*, (Feb. 29, 2000). (*See* **Exhibit U**).

[24] Cameroon consists of nearly 200 different ethnic groups, with the ruling group, the Betis, dominating. *See*

14

husband was a Beti (the ruling tribe in Cameroon).  When the police discovered that I was married to a Beti, they beat me even more severely.  I thought they were going to kill me.  I think they may have believed that my AIDS prevention work was an insult to my husband and his tribe.

52.    It was hard to distinguish the officers who beat me because there were so many. The officers constantly changed and it seemed as if I could go days without seeing the same officer twice.  The beating sessions could occur at any time of the day.  When the nighttime shift officers reported at the station, they would say to the daytime officers, "have you given them their coffee yet?" This was apparently a code or a joke that the officers used to ask each other whether or not that had beaten me and the other prisoners yet.

53.    I was not sure if the persons who interrogated me were higher ranking officers. They, like most of the officers, had marks on the sleeve of their shirts, that may have indicated their positions, but I am not sure what these marks said.

54.    In addition to the beating sessions, the police put cold water on the cement ground of our cell so that when, and if, we slept, we had to lay on a wet ground.  I was not given any food or water throughout the incarceration.

55.    After about three days, the police released me on approximately May 18, 2000, along with two of the other persons from UCV.  The other woman had been released after one day in prison.  When the police released me, they acted like nothing had happened.  It was

---

Freedom House, *supra* note 6.

15

amazing to me that one minute the officers could torture us and the next minute act as if they did not know what they had done to us. The officers who released me didn't say anything or explain why they released me.

56.     When I was released I could barely stand. I took a taxi home and the driver had to carry me into my living room. When my husband saw me he told me I should go to the hospital. My husband and his nephew took me to the hospital in Ebolowa and left me there. I believe that my husband could have prevented the incarceration and torture that I suffered at the hands of the police because he was a gendarme, and yet he did nothing.

57.     My face near my eyes was swollen and I was still partially blind because of the blow to my eye and the effects of the tear gas. I could not walk because the bottom of my feet and legs were bruised from the beatings. In particular, my left tibia was severely bruised. I was also bleeding due to the trauma during my pregnancy.

58.     I stayed at the hospital for three days. However, I did not have enough money for more treatment and had to call my family to take me home. I then went to stay at my family's house in Douala because there was no one to take care of me at my husband's residence in Ebolowa. I was in and out of the hospital in Douala with medical problems related to the beatings during this time. While I was recovering, I started to hemorrhage and experience pelvic pain. On approximately June 26, 2000, I went to the hospital in Douala where doctors told me that I had miscarried as a result of the beatings and torture that I had endured. I spent a week in the hospital after the miscarriage. When I told my husband that I had lost the baby, he said nothing.

16

59.    In the beginning of July I was released from the hospital and went to my family's home in Douala where I recovered with my sister and my children. I stayed there until September, when I went back to my husband's home in Ebolowa.

## I REFUSE TO GIVE UP MY POLITICAL ACTIVITES AND MY HUSBAND'S ABUSE ESCALATES

60.    In October, my husband began packing my belongings and made me sleep in a separate room outside of our bedroom so that he could more easily bring other women home. He would not even allow me access to the kitchen. I was essentially a prisoner in my own home.

61.    In addition to his threats and physical abuse, my husband took all the pictures of me off of our walls and hung a picture of his mistress in my place. At this time his mistress was sleeping in my bed. He said that he wanted this woman to be his second wife.

62.    Many nights I was afraid to return home because I knew there would be another woman with my husband, since his mistress was now essentially living in our home. Sometimes I would even call first to give him a warning of my arrival, but it did not make a difference. When other women were in the house, I would stay at my sister's house.

63.    Once, when I came home and found my husband with another woman – it was not even one of the women that I recognized – my husband lashed out at me, striking me in the side of my head with his hand and causing my ear to bleed. He then tore up our marriage certificate.

64.    In October 2000, I tried desperately to escape from my husband's abuse and started the required legal process for getting a divorce. In Cameroon, before a couple can divorce, a service processor called a "Huissier de Justice" must come to the couple's house to do

17

an accounting of the couple's state of affairs.

65.     On two occasions, an official came to our house at my request and tried to make a report, but my husband threatened him and scared him into leaving. My husband told the processor that he would kill him if he helped me pursue a divorce. Under customary law in many regions of Cameroon, women are considered the property of their husbands.[25] As a result, I was trapped in a marriage that I did not want. Nevertheless, I kept trying to escape my husband's abuse.

66.     The third time an official came to our house to do the accounting, my husband was not at home and so the processor was able to do his job. This time, he made an official report. (*See* **Exhibit D**). This report confirms how my husband forced me to live in a small separate room with a small wooden bed and describes how the door to the marital bedroom was locked with a bolt. It also confirms how my husband had replaced my picture on the walls with that of his mistress and had packed up my belongings in the kitchen, another room to which he denied me access.

67.     Even though the official made a report, my husband eventually found and threatened the official and ultimately no action was taken.

68.     Around the same time I complained to the service processor, I also complained about my husband's abuse to his boss, a Colonel at the Legion de Gendarmerie, the local gendarmerie station in Ebolowa. His boss summoned my husband to respond to my complaint,

---

[25] In Cameroon, the wife "is considered part of her husband's 'inheritance property' in that she can be bequeathed and inherited by his heirs." *Shadow Report, supra* note 3, at 3. Moreover, a wife cannot exercise "rights over her

but all my husband said in response was that he is the chief of his house and can do what he wants. He stated to his boss, "You are the boss in the service, I am in the chief in the house." Apparently the official accepted his response because he never did anything to help me. In Cameroon men will not get involved in what they consider to be another man's domestic business.[26] I also believe that the authorities never did anything because my husband was a gendarme.

69.     Ironically, although my husband would not allow me to leave him through a divorce, he did not want me to stay either. He threatened to kill me if I tried to divorce him while he continued to banish me in my home. I believe that he did not want me to pursue a formal separation because he feared the embarrassment of public exposure of his horrible treatment of me and did not want to answer to anyone for his actions. While my husband never acted as if his actions were wrong, he was determined not to let other people learn of his behavior.

70.     Instead of allowing me to seek a divorce, on October 17, 2000, my husband gave me a threatening letter. Through this letter, I believe that my husband was stating that if I did not leave the house, he would kill me.

71.     -I showed the note to the processor who came to our house. His report describes my husband's letter as liberating me as his wife. The processor noted that my husband stated that he might "commit an accident" if I did not leave the house.

---

own property without his consent." *Id.*
[26] *See 2001 Country Reports, supra* note 1 (noting that the "lack of a national legal code covering the family leaves women defenseless against male-oriented customs"); *see also Shadow Report, supra* note 3, at 13 (stating that "the practice [of domestic violence] is encouraged by judges' acceptance of the principle that a man has 'disciplinary

19

72.     After receiving the letter and my final failed attempt to start the process for a divorce, I was afraid for my life and left Ebolowa. I went to live with my sister in Douala, where my children were still living. Even while I was living at my family's house in Douala, my husband would attempt to control and threaten me.

73.     On one occasion, he came to my sister's house accompanied by a woman, whom I recognized as the wife of one of his friends. He never went anywhere without a woman on his arm. He told me that he could still kill me no matter where I was. I don't know what my husband wanted from me or why he still tried to contact me. Perhaps, in part, he was still trying to prevent me from seeking a formal divorce.

74.     In addition, thinking about how my husband did nothing to prevent the police from torturing me, I knew how much influence and power he wielded over my safety.

75.     In spite of my incarceration and my husband's continuing horrible treatment of me after my release, I was unwilling to abandon my SDF and NGO activities. As a result of my commitment to SDF, I continued to experience harassment by the police.

76.     During the twice-monthly SDF meetings at the party headquarters in Bepanda, the police regularly waited outside while we met and sometimes broke up the meetings while threatening me and the other members.

77.     In addition to the harassment I experienced at SDF functions, the police also targeted my business. On at least two occasions, the police vandalized my bar, stole my alcohol

---

rights' over his wife").

20

and money, and threatened me with imprisonment. I believe that I was an easy target for the police because I had been previously arrested.

78.    On one occasion, the police forced me into a car and took me to an old office, where they shoved me and threatened me with incarceration if I did not give them my money. Even though I gave the police all of the money that I could, they would soon target me again because of my AIDS prevention work, and that was something that I would not give up under their threats.

## MY SECOND IMPRISONMENT

79.    Around the beginning of November in 2001, I attended a meeting with about 30 other UCV members in Douala. This was one of our weekly meetings in the quarter. During the middle of the meeting, approximately ten armed policemen interrupted our gathering and arrested me for a second time.[27] This time the police arrested at least six of those present at the meeting.[28] In addition to me, four of the targeted individuals were members of UCV. The police also took an individual who had attended the meeting to obtain information about AIDS from UCV.

80.    This time the officers put me in my own cell at the prison.[29] I do not know what

---

[27]    There have been reported cases of police breaking up SDF meetings in private residences. In February, 2000 gendarmes arrested and detained SDF members in Kama, a village of Biwong Bane division, South Province. *2001 Country Reports*, *supra* note 1, at 16.

[28]    There could have been others taken but it is hard to know because men and women were not mixed in prison.

[29]    In addition to the extensive use of torture during incarceration, prison conditions in Cameroon have been described by the State Department as "life-threatening." *2001 Country Reports*, *supra* note 1, at 7. Prisons are overcrowded and unsanitary. "Credible press reports indicate that Douala's New Bell prison, originally built for 600 inmates, held more than 3,500 during the year, of which 2,000 were pretrial detainees." *Id.*.

21

happened to the other arrested individuals.

81.    The interrogations and torture sessions were very similar to my first incarceration, but this time far more severe. I believe that most of the scars and marks that I have on my body as a result of the torture, relate to injuries I received during my second incarceration. The police again took me out of my cell to another room when they beat me and again used their batons to strike me all over my body.

82.    This time the officers also sprayed me with a substance from a hose that at first I thought was water, but it made my skin burn and itch all over. I was choking and could barely breathe.

83.    During the interrogation sessions, the officers screamed at me and swung a machete toward me while I tried to answer their questions. As an officer barraged me with questions about where UCV got its funding and support, he swung the machete at me and sliced my skin under my upper arm and then again on my other arm just above the forearm. The knife caused deep gashes and I still bear physical scars of this torture.

84.    During this incarceration, the police confiscated my SDF and NGO cards and accused me of receiving money to defame the government. If I spoke without being addressed, the officers would strike me again.

85.    My sister and children did not know where I was for the entire eleven days that I was imprisoned. They thought that the police had killed me and disposed of my body. My family even went to the morgue to see if my body was there.

86.    When the police finally released me from prison, I could barely walk. I had

22

lacerations and bruises everywhere and my face was swollen from the beatings.  Upon my

release, the President of UCV and five others met me outside to pick me up.  Concerned that my

family did not know where I was, I asked them to first take me to my family home in Douala.

87.    When my older sister saw how I had been beaten and tortured, she was so

distraught she had a heart attack and died at the hospital later that day.  My injuries were so

severe that I spent two to three weeks in the hospital.

88.    I called my husband from the hospital, and told him that my sister had died.

While he did not come to see me in the hospital, he later attended the mourning period for my

sister.  I don't believe that my husband came because of me.  Rather, my sister's death was so

tragic, it touched everyone, even my husband.

89.    After my sister's death, I seriously debated whether to continue my activities in

with UCV.  After everything that had happened to me, the death of my sister was that much more

traumatic.  I feared for my safety and the safety of my children.  Although I still maintained my

membership in SDF, I decided to decrease my involvement for a while.  I also pulled back from

my work with the UCV.

90.    Even after the severe injuries I sustained after my second imprisonment, I

eventually decided that I could not give up my work forever.  As a mother, I saw what AIDS was

doing to the youth of Cameroon, and after a short break, I decided to continue with the UCV and

started attending meetings again.

## MY THIRD IMPRISONMENT

91.    In May, 2002, I attended a UCV meeting in Douala at a room where we usually

23

hold SDF meetings. About 30 people attended to discuss the future of UCV. Many people were scared to keep working because of what had happened to some of us in prison. The discussion focused on changing the name of the NGO so that we could continue to work for our cause, but avoid the association of our organization with SDF in the minds of the government.

92.     Suddenly the police arrived in a small truck and sprayed the group with water. The officers started beating the group of presenters and took me and three others with them to the prison.

93.     I believe that the police targeted me because they recognized me from my prior SDF and UCV activities.

94.     This time the officers put me in a cell alone. Again, they did not feed me or give me any water. They interrogated me the same as they had during the first two incarcerations, but did not harm me as severely as my second imprisonment. However, because of the past torture I had endured, I was already so terrified that I would scream as soon as the officers came into my cell. Twice, during the incarceration, the police hit me with a belt and a baton, causing cuts and bruises. While I was in my cell, one officer also branded me on my back with a hot iron.

95.     Because the meeting was in Douala, I was imprisoned in Douala, where my children were living. Someone who knew me and had attended the meeting, therefore, was able to tell my children where I was.

96.     Because the police nearly killed me during my previous imprisonment, my children were terrified that the police would really kill me this time. My children found my brother-in-law, the son of my husband's sister, and told him what happened to me.

24

97.     I was kept in prison for about 6 days.  When the police released me, my brother-in-law was waiting for me outside the jail.  I do not know whether he bribed someone to secure my release, but that is a strong possibility.  My brother-in-law is a member of the Beti tribe, like my husband.  Therefore, he had more power than non-Betis and possibly had contacts in the government.

### RAPES BY POLICE OFFICERS

98.     My brother-in-law told me that as a condition of my release, I was to report back the next day to the police commissariat at the same station from which I was just released.

99.     I reported to the commissariat early in the morning and was then kept there until about 1:00 a.m.  The officers told me to sit with my back to the wall and my feet out.  I waited in that position all day long, while the officials refused to answer my questions.  Finally, at about 1:00 am, the officer then stated that he would take me home.  While he was driving me home he pulled the car over to the side of the road and raped me.  I did not fight back because I knew that all he had to do was choke me.  The officer then ordered me to return to the station the next day.  When I asked him why he just stated, "did we hurt you or bother you? All you had to do was sit there.  You must come back."

100.    I tried to reach my brother-in-law, but I could not find him to tell him what had happened. I was terrified and confused and didn't know what to do or what would happen to me.

101.    The next day, I returned to the Commissariat as the officer instructed me to do.  Once again I was kept there all day long.  On the way home in the car, a different police officer raped me.

25

102.    When I reached my brother-in law and told him what had happened, he said "don't tell me another word, don't go back there." He said he would help me escape because I was no longer safe.

## MY ESCAPE

103.    My brother-in law gave me money and told me to go and hide in the Western Province where some distant members of my family lived. He told me to wait there until he could gather enough money for me to leave.

104.    I paid for a mini-bus with the money that my brother-in-law had given me, and traveled the six hours to the village of Bantoum, which is near Bangangte in the Western Province of Cameroon. I stayed with my mother's family (the younger brother of my mother). Although I did not know my uncle and his family very well, they saw the terrible condition that I was in and immediately took me in.

105.    I arrived in Bantoum at the end of May and stayed there for approximately two to three weeks until my brother in law could help me escape. He did not tell anyone where I was, not even my children.

106.    However, I was still not safe in Bantoum. Even after I finally escaped six hours away, my husband tracked me down at my uncle's house. He told me that he was still able to kill me no matter what, and that I was still his wife and had to obey him. He told me, "If you take me to court I will kill you." He called also me in Bantoum and threatened to kill my uncle. I did not understand his actions, but I was terrified that my husband was able to trace me to my family's house and still wanted to cause me harm even after I left his house. In addition, I was scared

26

because I knew that my husband could turn me into the police whenever he wanted.

107.    On June 19, 2002, my brother-in law helped me obtain a B-1 Visitor's Visa to United States at the United States Embassy in Yaounde, Cameroon. I already had my passport.

108.    I arrived in the United States on July 12, 2002 by airplane with a short stopover for a few hours at Charles DeGualle Airport in Paris, France.

109.    I arrived in the United States in Washington, D.C. On the plane, I met a priest from the United States named Pastor Wesley. I explained to him my situation and the torture I had suffered and he befriended me. He brought me to the Bethel World Outreach Church located at 8242 Georgia Avenue in Silver Spring, Maryland where I stayed for approximately two and a half months.

110.    While I was at the church, I called my children in Cameroon and spoke to them. They were still living at my family's house in Douala. My oldest son told me that the police were looking for me. He also told me my brother-in-law had been killed for helping me escape. He would not tell me who killed my brother-in-law, but I believe it was the government in retribution for helping me escape.

111.    Concerned about my situation, members of the church tried to find me help. At a party for the anniversary of the church, I was put in touch with Alex Takouezim, at the International Institute of New Jersey. The church then gave me money to buy a bus ticket and I came to New Jersey. When I arrived here I got in touch with Alex. I was going to stay at a shelter, but because it was a Saturday they could not take me right away. Alix called someone at Safe Horizons who took me in and allowed me to sleep on his couch. I am still staying with him.

27

## THE PERSECUTION OF MY CHILDREN

112.    Whenever I speak to my children, they are terrified and tell me that the police keep looking for me and harassing them.  They are still living in my family home in Douala with my sister's daughter and two of my husband's children.

113.    On February 27, 2003, my former neighbors in Cameroon, called the home where I'm staying in the Bronx, New York, and told me that the police had taken my 16-year-old son, Brice Marius Teumen and that he had not been seen for over a week.[30]  One of my other sons, Duclo Romuald Mbiakop followed the police to see where the police were taking his brother.  The police saw Duclo and then went back to the house for him.  Because Duclo knew the police were after him, he hid.  However, my youngest son, Pegui William Tchaptchet, who is 13, was sleeping at the house and the police took him instead.  The police detained and beat both my sons.  It pains me to even imagine that my children also endured the torture that I experienced in prison.  Both of my sons have now been returned.  However, all of my children now live in constant fear that the police will come back for them.

114.    If I return to Cameroon, I fear I will be imprisoned and tortured again.  The government is actively looking for me and I have been previously raped by the police.  The police know of my political activity and that my husband is a Beti and a gendarme.  I believe I

---

[30]  Although prohibited by law, there have been credible reports of disappearances, torture, beatings and other abuses of prisoners.  Children are not immune from abuse.  *See 2001 Country Reports, supra* note 1, at 2.

will be killed by the police, government or my husband if I return. Further I fear for the safety of my children since the police have arrested and abused two of my children already.

## CONCLUSION

I ask the United States Government to recognize that the state of Cameroon has sanctioned the persecution that I have suffered in Cameroon due to my political activities and beliefs, and my membership in a particular social group of women dedicated to AIDS activism. I ask this government to acknowledge that I will be further persecuted if I return to Cameroon, and to grant my asylum in the United States.

I understand that if I knowingly have made any false statement herein, I am subject to punishment.

Dated: April 2, 2003
      Newark, New Jersey

Rose Ngassam

Sworn to before me this 2ND day of April.

Melinda Lampley
Notary Public

MELINDA D. LAMPLEY
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires June 2, 200_

30

# EXHIBIT 3

Rose Ngassam,

                       Petitioner

       - against -

MICHAEL CHERTOFF, Secretary, Department of
Homeland Security; EMILIO T. GONZALEZ,
Director, United States Citizenship and
Immigration Services; and GERARD
HEINAUER, Director, United States Citizenship
and Immigration Services Nebraska Service Center

                Respondents.

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
NEW YORK**

Civ. No. ___

**AFFIDAVIT OF PLAINTIFF ROSE
NGASSAM IN SUPPORT OF ORDER TO
SHOW CAUSE FOR PRELIMINARY
INJUNCTION**

I, Rose Ngassam, being duly sworn, do state:

1.     I am 45 years of age and understand the obligation of an oath.  I am an asylee and

make the following statements concerning my need for immediate review of the

agency's wrongful denial of my right to reunify with three of my children.

2.     I am a citizen of Cameroon, where I was born and resided until I arrived in the

United States on July 12, 2002.  After I was granted asylum on June 3, 2003, I

filed I-730 petitions for my seven children to join me in the United States.  The

petitions were granted in May and September 2005.  Three of those petitions were

later reopened and denied in May 2007.  I fear that the remaining petitions will

1

also be revoked unless the agency is ordered to properly consider my case and my evidence in support of the petitions.

3.    I submit this affidavit to explain the urgent need to expedite review of my case.

4.    Without speedy intervention from this Court, my family members remain at risk of further abuse by the Cameroonian police, possibly including arrest, torture, rape, or even death.   The police have targeted my family since I fled from Cameroon.  As I explain in more detail below, I recently received the devastating news that police officers attacked my son and daughter at my family home in Douala and raped my daughter repeatedly.   I live with constant anguish, worry, guilt and fear.

### After I Flee Cameroon, the Police Harass and Abuse My Children, Leading to Their Displacement

5.    When I escaped Cameroon in 2002 after being imprisoned and tortured by the Cameroonian government, I was forced to leave behind my children.

6.    This was an incredibly difficult decision for me – but I felt that the government left me with no choice.  I feared for my children's safety and wanted to parent and protect them, but I believed that if I stayed in Cameroon I would be killed and unable to help them in any way.

7.    When I left Cameroon, I knew that my children would not have any parent to watch over them.

2

8.     During the period before I fled Cameroon, my husband was stationed in Ebolowa, Cameroon.  I lived in Douala with my children at my family house, where I also maintained my small business.   I was sometimes away in Ebolowa with my husband for a few days at a time.  During those periods, my children would stay in Douala, where my brother and my sisters watched over them.

9.     My asylum claim was based, in part, upon the extreme cruelty I suffered at the hands of my estranged second husband.

10.    As I explained in my asylum affidavit, my husband, who is a gendarme, beat me and retaliated against me because he believed my political activities and independence were an insult to him as a man and as a gendarme for the regime.

11.    After I sought refuge in the United States, my husband remained hostile to my children because of their connection to me.  He does not live with them or make any effort to care for them.  Thus, when I fled Cameroon, I depended upon my family to watch over my children.  My brother, Jean Mangwa, took primary responsibility to care for them.

12.    After I arrived in the U.S., whenever I wanted to speak to someone in my family, I called my brother's cell phone.  He lived in his own house near my family home in Douala.

3

13.    Every time I spoke to my children, they were terrified and told me that the police kept looking for me and harassing them. When I first arrived in the U.S., my children were still living in my family home in Douala.

14.    As I explained in my asylum affidavit, on February 27, 2003, my neighbor in Cameroon, called the home where I was staying in the Bronx and told me that the police had taken my 16-year-old son, Brice Marius Teumen and that he had not been seen for over a week. One of my other sons, Duclo Romuald Mbiakop followed the police to see where the police were taking his brother. The police saw Duclo and then went back to the house for him. Because Duclo knew the police were after him, he hid. However, my youngest son, Pegui William Tchaptchet, who was 13 at the time, was sleeping at the house and the police took him instead. The police detained and beat both my sons.

15.    Although the police released them, it pains me to even imagine that my children endured the torture that I experienced in prison. My children then lived in constant fear that the police would come back. My family never told me all of the details of what happened. I believe they did not want to cause additional stress for me and thought that I could not do anything from abroad.

16.    During one particular incident of harassment by the police, officers came to our family house and ransacked the house and took everything. Because of the

4

constant harassment and the long delay in bringing them to safety, my children began to fend for themselves and were displaced from our family home.

17.  As time went on, when I called my brother to check in on my children, who were teenagers at the time, he started to tell me that they were no longer living in the family home and had taken off to various locations seeking safety from the abuse and harassment from the police.

18.  For example, my youngest, Pegui William, fled to my niece's house in Bonamoussadi.  My son Junior Wimga started living with my oldest sister in another neighborhood of Douala.  My oldest son, Achille Martial, fled to Nigeria and lost contact with most of his siblings.

19.  Often when I called my brother or reached some of my sons by telephone, they did not know the whereabouts of their other siblings.  Sometimes they would pass along a phone number of where I could reach another one of my children.

20.  For periods of time I did not know where my son Brice Marius Teuman or my daughter Robertina was living.  I believe that Robertina was living with friends for some time.   At this moment, I do not know the exact location of all of my children.

21.  Many of my children are very angry at me and resentful that I left them behind. This has been horribly painful for me.

5

22.    For example, I have only spoken with my son Jackson about three times since I
came to the United States.  He has always been very nervous and angry when I ask
him about his safety.  I believe that my children have lost all faith that I will ever
bring them to safety in the United States – this causes me enormous distress and
guilt.

23.    My son Duclo is the one son whom I have talked to the most since I fled
Cameroon.  He has always been very attached to me, and always responds to me
when I call.  He often provides me with what little information I have about the
well-being and whereabouts of all of my children.  Whenever I send money to my
children in Cameroon, I send it to Duclo in his name.[1]

24.    Since I filed my asylum affidavit, I have learned from my brother, my former
pastor, and sometimes my former neighbors, about additional arrests by the police
of my children.  For example, once my pastor called me and told me that my son
Jackson was imprisoned and that I should send money as soon as possible to pay
the police for his release.  I sent money by western union to my pastor to secure
my son's release.  I last did this at the beginning of this year.

25.    I have received so much bad news from my country about my family's well-being,
that I have a hard time remembering all of the horrible things that have happened

---

[1] When I asked my children to have DNA testing done in Cameroon to support my asylee-relative petitions, I sent
my instructions through Duclo.

6

to my children since I fled.  I try not to think about these things because they cause

me incredible pain.

### I Am Afraid for My Children's Lives Because Both My Brother-in-law and My Brother Were Killed After Helping Me and My Children.

26.    I am particularly worried about my children's safety in light of the deaths of my

brother-in-law and my brother.

27.    As I explained in my affidavit submitted in support of my asylum application, my

husband's brother helped me escape from Cameroon.  During my last

imprisonment, my children were terrified that the police would kill me and asked

my brother-in-law to help me.  When I was released after six days in prison, my

brother-in-law was waiting for me.  I do not know whether he bribed someone to

secure my release, but that is a strong possibility.  He is an ethnic Beti, and,

therefore, had more power and possibly contacts in the government.

28.    After the police released me, they required me to report daily at the police station.

I only reported the first two days after I was released because I was raped both

times.  My brother-in-law then helped me hide in western Cameroon, and obtain a

visa to travel to the United States.

29.    After I arrived in the United States and was staying temporarily in a church, I

called my children in Cameroon and spoke to them.  One of my sons told me that

the police were looking for me and that my brother-in-law had been killed for

helping me escape.  He would not tell me the details of what happened, but I

7

believe he was killed by the government in retribution for helping me escape. My children told me that they saw the police come and take him from his house. After that, no one ever saw him again.

30. A good friend of mine from Douala, Aladji Ousman, a Muslim from Niger who lived in Cameroon, later called me and told me that the body of my brother-in-law had been found. Aladji has since moved back to his own country and I lost track of him.

31. I was horrified that my activities may have cost my brother-in-law his life and experienced profound guilt and anxiety about the safety of the rest of my family.

32. In April 2006, I experienced this terror again when I learned that another member of my family, my brother Jean Mangwa, was also killed.

33. As I explained in my February 1, 2006 supplemental affidavit submitted to the agency, my brother helped me to obtain my children's birth certificates after I realized the ones originally provided with my application were not authentic.

34. In May of last year, I received the shocking news that my brother had been killed in Cameroon. I am unaware of the details surrounding his death, however, from what he revealed to me in phone conversations prior to his death, I am certain that he was murdered.

35. I spoke to my brother at the end of April, shortly before his death, and he told me that he was certain he was going to die. He also told me that he wished my

8

children would leave Cameroon immediately.  He feared for his safety and for theirs.  He asked me to make sure to buy him a good coffin.

36.   I was extremely alarmed and disturbed by his talk of death and coffins, and tried to get more information from him on what it was he feared, but he would not tell me anything.  I think he did not want to distress me or make me feel guilty that I put him in danger.

37.   I was very worried and in the following days I tried desperately to contact him again.  I also tried to reach my sister, Alice, who also lives in Douala.  No one would speak to me.

38.   Soon thereafter, I learned from my mother's oldest brother, Tcthaptch Philip, who at the time was living in Yaonde, Cameroon, that my brother Jean Mangwa had been killed.  He told me that my family called him to tell him the news and he then went to Douala to be with the family.

39.   I tried to talk to my brother's wife, but she refused.  I believe she is angry at me because she believes that I put her husband in danger by asking him to watch over my children and to help me obtain the children's real birth certificates.

40.   It is hard to piece together what happened to my brother when I am so far away, but I believe he was targeted by the government for helping me.

41.   To confirm the death of my brother in law, I have obtained a fax copy of his death certificate from my family members in Cameroon, which my attorneys have

9

attached as Exhibit 25.  The death certificate confirms that my brother did not

pass away from natural causes.  The death certificate states that he suffered head

trauma.

42.  I believe my country is becoming more dangerous – the police have no respect for

anyone's rights and if you are not a member of the ethnic majority you are at

constant risk of being targeted by the police.

43.  I have always been fearful for my children's safety since I fled Cameroon,

particularly after the police arrested and interrogated them.  But now, I am even

more fearful than ever because my brother is gone.  When he was with my

children, I was reassured that he would try to protect them and that anyone who

wanted to harm my children would have to go through him first.  Now that he is

gone, there is nothing protecting my children from further persecution from the

police.

44.  My children can not turn to my former husband for protection because they are

afraid of him and he does not do anything to care for them.

45.  After the deaths of my brother-in-law and my brother, I fear that it is only a matter

of time before one of my children is killed.

### This Month Police Officers Attacked My Family and
### Raped My Daughter Repeatedly

46.  Last week, my nephew, Germain, the son of my oldest sister, called me in the

middle of the night to tell me terrible news that he had learned from a friend in

10

Cameroon. Germain, who lives in Germany, said that several armed men in military fatigues went to my family home in Douala, entered the house and attacked my daughter. I believe that my son Brice, my daughter Robertine, and my son Duclo were present at the house at the time.

47.   According to my nephew, my son Brice fled the scene because he was afraid of being arrested and tortured again. Duclo tried to go to my daughter's defense, but the men beat him and stopped him from intervening. Three officers then raped Robertine in front of her brother, who was unable to help because he was immobilized by the men.

48.   Duclo and Robertine were then treated at a hospital. I have since spoken to several neighbors who were aware of this attack. I asked them and my family to go to the hospital and obtain a record of what happened. A few weeks after the attack, my son Duclo was able to obtain a record of his and his sister's treatment from the hospital. He then faxed a copy of those records to my attorneys. I also asked him to send the original document in the mail. May attorneys have attached that the fax of that document as Exhibit 24.

49.   Upon hearing this news, I asked myself why I am even in this country. I don't know how I can continue to live here while my children suffer like this, but I know if I return to Cameroon I will be killed.

11

50.    I know it is only a matter of time before the government of Cameroon targets one of my children again, I ask the Court to consider my complaint as soon as possible.

51.    Since I fled Cameroon in search of safety, I have spent every day since worrying about the safety of my children, and trying to hold out hope that one day they will be reunited with me in the United States. It has been five years since I have seen them and with each day that passes, the pain and despair I experience daily grows deeper.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I understand that if I knowingly have made any false statement herein, I am subject to punishment.

Dated:

Newark, New Jersey                                    Rose Ngassam

Notarized by:

State of New Jersey
County of Essex

Maria F. Martino

September 7, 2007

MARIA F. MARTINO
A Notary Public of New Jersey
My Commission Expires July 25, 2010                    12