Rose Ngassam,

               Petitioner

    - against -

MICHAEL CHERTOFF, Secretary, Department of
Homeland Security; EMILIO T. GONZALEZ,
Director, United States Citizenship and
Immigration Services; and GERARD
HEINAUER, Director, United States Citizenship
and Immigration Services Nebraska Service
Center

              Respondents.

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
NEW YORK**

Civ. No. 07 Civ. 8172 (LLS)

**AFFIDAVIT OF PLAINTIFF ROSE
NGASSAM IN SUPPORT OF ORDER TO
SHOW CAUSE FOR PRELIMINARY
INJUNCTION**

I, Rose Ngassam, being duly sworn, do state:

    1.    I am 45 years of age and understand the obligation of an oath.  I am an asylee and

make the following statements concerning my need for immediate review of the

agency's wrongful denial of my right to reunify with three of my children.

    2.    I am a citizen of Cameroon, where I was born and resided until I arrived in the

United States on July 12, 2002.  After I was granted asylum on June 3, 2003, I

filed I-730 petitions for my seven children to join me in the United States.  The

petitions were granted in May and September 2005. Three of those petitions were

later reopened and denied in May 2007.  I fear that the remaining petitions will

1

also be revoked unless the agency is ordered to properly consider my case and my evidence in support of the petitions.

3.  I submit this affidavit to explain the urgent need to expedite review of my case.

4.  Without speedy intervention from this Court, my family members remain at risk of further abuse by the Cameroonian police, possibly including arrest, torture, rape, or even death.   The police have targeted my family since I fled from Cameroon.  As I explain in more detail below, I recently received the devastating news that police officers attacked my son and daughter at my family home in Douala and raped my daughter repeatedly.   I live with constant anguish, worry, guilt and fear.

### After I Flee Cameroon, the Police Harass and Abuse My Children, Leading to Their Displacement

5.  When I escaped Cameroon in 2002 after being imprisoned and tortured by the Cameroonian government, I was forced to leave behind my children.

6.  This was an incredibly difficult decision for me – but I felt that the government left me with no choice.  I feared for my children's safety and wanted to parent and protect them, but I believed that if I stayed in Cameroon I would be killed and unable to help them in any way.

7.  When I left Cameroon, I knew that my children would not have any parent to watch over them.

8.      During the period before I fled Cameroon, my husband was stationed in Ebolowa, Cameroon. I lived in Douala with my children at my family house, where I also maintained my small business. I was sometimes away in Ebolowa with my husband for a few days at a time. During those periods, my children would stay in Douala, where my brother and my sisters watched over them.

9.      My asylum claim was based, in part, upon the extreme cruelty I suffered at the hands of my estranged second husband.

10.     As I explained in my asylum affidavit, my husband, who is a gendarme, beat me and retaliated against me because he believed my political activities and independence were an insult to him as a man and as a gendarme for the regime.

11.     After I sought refuge in the United States, my husband remained hostile to my children because of their connection to me. He does not live with them or make any effort to care for them. Thus, when I fled Cameroon, I depended upon my family to watch over my children. My brother, Jean Mangwa, took primary responsibility to care for them.

12.     After I arrived in the U.S., whenever I wanted to speak to someone in my family, I called my brother's cell phone. He lived in his own house near my family home in Douala.

13.    Every time I spoke to my children, they were terrified and told me that the police

kept looking for me and harassing them.  When I first arrived in the U.S., my

children were still living in my family home in Douala.

14.    As I explained in my asylum affidavit, on February 27, 2003, my neighbor in

Cameroon, called the home where I was staying in the Bronx and told me that the

police had taken my 16-year-old son, Brice Marius Teumen and that he had not

been seen for over a week.  One of my other sons, Duclo Romuald Mbiakop

followed the police to see where the police were taking his brother.  The police

saw Duclo and then went back to the house for him.  Because Duclo knew the

police were after him, he hid.  However, my youngest son, Pegui William

Tchaptchet, who was 13 at the time, was sleeping at the house and the police took

him instead.  The police detained and beat both my sons.

15.    Although the police released them, it pains me to even imagine that my children

endured the torture that I experienced in prison.  My children then lived in

constant fear that the police would come back. My family never told me all of the

details of what happened.  I believe they did not want to cause additional stress for

me and thought that I could not do anything from abroad.

16.    During one particular incident of harassment by the police, officers came to our

family house and ransacked the house and took everything.   Because of the

4

constant harassment and the long delay in bringing them to safety, my children began to fend for themselves and were displaced from our family home.

17.     As time went on, when I called my brother to check in on my children, who were teenagers at the time, he started to tell me that they were no longer living in the family home and had taken off to various locations seeking safety from the abuse and harassment from the police.

18.     For example, my youngest, Pegui William, fled to my niece's house in Bonamoussadi.  My son Junior Wimga started living with my oldest sister in another neighborhood of Douala.  My oldest son, Achille Martial, fled to Nigeria and lost contact with most of his siblings.

19.     Often when I called my brother or reached some of my sons by telephone, they did not know the whereabouts of their other siblings.  Sometimes they would pass along a phone number of where I could reach another one of my children.

20.     For periods of time I did not know where my son Brice Marius Teuman or my daughter Robertina was living.  I believe that Robertina was living with friends for some time.   At this moment, I do not know the exact location of all of my children.

21.     Many of my children are very angry at me and resentful that I left them behind. This has been horribly painful for me.

22.    For example, I have only spoken with my son Jackson about three times since I came to the United States. He has always been very nervous and angry when I ask him about his safety. I believe that my children have lost all faith that I will ever bring them to safety in the United States – this causes me enormous distress and guilt.

23.    My son Duclo is the one son whom I have talked to the most since I fled Cameroon. He has always been very attached to me, and always responds to me when I call. He often provides me with what little information I have about the well-being and whereabouts of all of my children. Whenever I send money to my children in Cameroon, I send it to Duclo in his name.[1]

24.    Since I filed my asylum affidavit, I have learned from my brother, my former pastor, and sometimes my former neighbors, about additional arrests by the police of my children. For example, once my pastor called me and told me that my son Jackson was imprisoned and that I should send money as soon as possible to pay the police for his release. I sent money by western union to my pastor to secure my son's release. I last did this at the beginning of this year.

25.    I have received so much bad news from my country about my family's well-being, that I have a hard time remembering all of the horrible things that have happened

---

[1] When I asked my children to have DNA testing done in Cameroon to support my asylee-relative petitions, I sent my instructions through Duclo.

6

to my children since I fled. I try not to think about these things because they cause me incredible pain.

**I Am Afraid for My Children's Lives Because Both My Brother-in-law and My Brother Were Killed After Helping Me and My Children.**

26.    I am particularly worried about my children's safety in light of the deaths of my brother-in-law and my brother.

27.    As I explained in my affidavit submitted in support of my asylum application, my husband's brother helped me escape from Cameroon. During my last imprisonment, my children were terrified that the police would kill me and asked my brother-in-law to help me. When I was released after six days in prison, my brother-in-law was waiting for me. I do not know whether he bribed someone to secure my release, but that is a strong possibility. He is an ethnic Beti, and, therefore, had more power and possibly contacts in the government.

28.    After the police released me, they required me to report daily at the police station. I only reported the first two days after I was released because I was raped both times. My brother-in-law then helped me hide in western Cameroon, and obtain a visa to travel to the United States.

29.    After I arrived in the United States and was staying temporarily in a church, I called my children in Cameroon and spoke to them. One of my sons told me that the police were looking for me and that my brother-in-law had been killed for helping me escape. He would not tell me the details of what happened, but I

7

believe he was killed by the government in retribution for helping me escape. My children told me that they saw the police come and take him from his house. After that, no one ever saw him again.

30. A good friend of mine from Douala, Aladji Ousman, a Muslim from Niger who lived in Cameroon, later called me and told me that the body of my brother-in-law had been found. Aladji has since moved back to his own country and I lost track of him.

31. I was horrified that my activities may have cost my brother-in-law his life and experienced profound guilt and anxiety about the safety of the rest of my family.

32. In April 2006, I experienced this terror again when I learned that another member of my family, my brother Jean Mangwa, was also killed.

33. As I explained in my February 1, 2006 supplemental affidavit submitted to the agency, my brother helped me to obtain my children's birth certificates after I realized the ones originally provided with my application were not authentic.

34. In May of last year, I received the shocking news that my brother had been killed in Cameroon. I am unaware of the details surrounding his death, however, from what he revealed to me in phone conversations prior to his death, I am certain that he was murdered.

35. I spoke to my brother at the end of April, shortly before his death, and he told me that he was certain he was going to die. He also told me that he wished my

8

children would leave Cameroon immediately. He feared for his safety and for theirs. He asked me to make sure to buy him a good coffin.

36.    I was extremely alarmed and disturbed by his talk of death and coffins, and tried to get more information from him on what it was he feared, but he would not tell me anything. I think he did not want to distress me or make me feel guilty that I put him in danger.

37.    I was very worried and in the following days I tried desperately to contact him again. I also tried to reach my sister, Alice, who also lives in Douala. No one would speak to me.

38.    Soon thereafter, I learned from my mother's oldest brother, Tcthaptch Philip, who at the time was living in Yaonde, Cameroon, that my brother Jean Mangwa had been killed. He told me that my family called him to tell him the news and he then went to Douala to be with the family.

39.    I tried to talk to my brother's wife, but she refused. I believe she is angry at me because she believes that I put her husband in danger by asking him to watch over my children and to help me obtain the children's real birth certificates.

40.    It is hard to piece together what happened to my brother when I am so far away, but I believe he was targeted by the government for helping me.

41.    To confirm the death of my brother in law, I have obtained a fax copy of his death certificate from my family members in Cameroon, which my attorneys have

9

attached as Exhibit 25.  The death certificate confirms that my brother did not pass away from natural causes.  The death certificate states that he suffered head trauma.

42.  I believe my country is becoming more dangerous – the police have no respect for anyone's rights and if you are not a member of the ethnic majority you are at constant risk of being targeted by the police.

43.  I have always been fearful for my children's safety since I fled Cameroon, particularly after the police arrested and interrogated them.  But now, I am even more fearful than ever because my brother is gone.  When he was with my children, I was reassured that he would try to protect them and that anyone who wanted to harm my children would have to go through him first.  Now that he is gone, there is nothing protecting my children from further persecution from the police.

44.  My children can not turn to my former husband for protection because they are afraid of him and he does not do anything to care for them.

45.  After the deaths of my brother-in-law and my brother, I fear that it is only a matter of time before one of my children is killed.

**This Month Police Officers Attacked My Family and
Raped My Daughter Repeatedly**

46.  Last week, my nephew, Germain, the son of my oldest sister, called me in the middle of the night to tell me terrible news that he had learned from a friend in

10

Cameroon. Germain, who lives in Germany, said that several armed men in military fatigues went to my family home in Douala, entered the house and attacked my daughter. I believe that my son Brice, my daughter Robertine, and my son Duclo were present at the house at the time.

47. According to my nephew, my son Brice fled the scene because he was afraid of being arrested and tortured again. Duclo tried to go to my daughter's defense, but the men beat him and stopped him from intervening. Three officers then raped Robertine in front of her brother, who was unable to help because he was immobilized by the men.

48. Duclo and Robertine were then treated at a hospital. I have since spoken to several neighbors who were aware of this attack. I asked them and my family to go to the hospital and obtain a record of what happened. A few weeks after the attack, my son Duclo was able to obtain a record of his and his sister's treatment from the hospital. He then faxed a copy of those records to my attorneys. I also asked him to send the original document in the mail. May attorneys have attached that the fax of that document as Exhibit 24.

49. Upon hearing this news, I asked myself why I am even in this country. I don't know how I can continue to live here while my children suffer like this, but I know if I return to Cameroon I will be killed.

50.    I know it is only a matter of time before the government of Cameroon targets one of my children again, I ask the Court to consider my complaint as soon as possible.

51.    Since I fled Cameroon in search of safety, I have spent every day since worrying about the safety of my children, and trying to hold out hope that one day they will be reunited with me in the United States.  It has been five years since I have seen them and with each day that passes, the pain and despair I experience daily grows deeper.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I understand that if I knowingly have made any false statement herein, I am subject to punishment.

Dated:

Newark, New Jersey                                               Rose Ngassam

Notarized by:

State of New Jersey
County of Essex
Maria F. Martino
September/7, 2007
MARIA F. MARTINO
A Notary Public of New Jersey
My Commission Expires July 25, 2010

12